### THE SKULL VALLEY BAND OF GOSHUTE INDIANS and Private Fuel Storage, L.L.C., Plaintiffs,

v.

Michael O. LEAVITT, in his official capacity as Governor of the State of Utah; Mark L. Shurtleff, in his official capacity as Attorney General of the State of Utah; Dianne R. Nielson, in her official capacity as Executive Director of the Utah Department of Environmental Quality; Thomas Warne, in his official capacity as Executive Director of the Utah Depart-

ment of Transportation; Glen Edward Brown, Stephen M. Bodily, Hal Mendenhall Clyde, Dan R. Eastman, Sheri L. Griffith, James Grey Larkin, and Ted D. Lewis, in their official capacities as Commissioners of the Utah Department of Transportation Defendants.

No. 2:01–CV–270C.

United States District Court,
D. Utah,
Central Division.

July 30, 2002.

James A. Holtkamp, LeBoeuf Lamb Greene & MacRae, LLP, Salt Lake City, Tim Vollmann, Albuquerque, NM, for Skull Valley Band of Goshute Indians.

Val R. Antczak, J. Michael Bailey, Henry D. Owens, Parsons Behle & Latimer, Salt Lake City, UT, Jay E. Silberg, Ernest L. Blake, Jr., Shaw Pittman Potts & Trowbridge, Washington, DC, for Private Fuel Storage.

Carlie Christensen, U.S. Attorney's Office, Maureen E. Rudolph, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for U.S.

James R. Soper, Utah Atty. General's Office, Salt Lake City, UT, Lawrence J. Jensen, Office of Solicitor, Dept. of Interior, Washington, DC, Monte Neil Stewart, Helen A. Frohlich, Utah Atty. General's Office, Salt Lake City, UT, for Michael O. Leavitt, Mark L. Shurtleff.

## ORDER

CAMPBELL, District Judge.

This case arises out of Plaintiffs Skull Valley Band of Goshute Indians' ("Skull Valley Band") and Private Fuel Storage, L.L.C.'s ("PFS") agreement to permit PFS to build and operate a spent nuclear fuel ("SNF") storage facility in Utah on the tribal reservation lands of the Skull Valley Band. SNF is a waste product generated by commercial nuclear reactors. Plaintiffs filed an action seeking declaratory and injunctive relief from the operation of several Utah laws. The Defendants are various high-ranking officials in Utah State government, including Michael O. Levitt, the Governor of the State, and Mark L. Shurtless, the State Attorney General.

Plaintiffs' complaint alleges eight claims for relief: (1) Declaratory Judgment—Supremacy Clause, Preemption; (2) Declaratory Judgment—Commerce Clause; (3) Declaratory Judgment—Pre-eminent Federal Authority over Indian Affairs, Indian Commerce Clause, Treaty Clause, Supremacy Clause; (4) Declaratory Judgment—Federal Indian Law/ Indian Sovereignty Doctrine; (5) Declaratory Judgment—Contract Clause; (6) Declaratory Judgment—Deprivation of Property; (7) Declaratory Judgment—First, Sixth, and Fourteenth Amendments; and (8) Injunction.

Defendants filed an Amended Counterclaim on August 8, 2001, alleging that (1) the Nuclear Regulatory Commission ("NRC") has no authority to license a private, for profit, off-site spent nuclear fuel ("SNF") storage facility; (2) an NRC license will necessarily violate the National Environmental Policy Act ("NEPA") and therefore be invalid; (3) Skull Valley Band has not lawfully approved the lease; (4) the conditional approval of the lease by the Bureau of Indian Affairs ("BIA") occurred in violation of governing laws and rules; and (5) any BIA approval of the lease will be invalid as a breach of the Government's trust obligation.

This matter comes before the court on several motions. Plaintiffs filed a joint motion for summary judgment, a motion to dismiss counterclaims, and a motion to strike Defendants' motion suggesting lack of jurisdiction. Plaintiff Skull Valley Band filed a separate motion for summary judgment. Defendants filed a motion for judgment on the pleadings and a suggestion of lack of jurisdiction under Federal Rule of Civil Procedure 12(h)(3). Defendants treat their motion for judgment on the pleadings and suggestion of lack of jurisdiction as one and the same.

## FACTS

The reality of an ever-increasing backlog of SNF in temporary storage has created a national problem. Currently, temporary on-site storage of SNF holds approximately 38,500 metric tons of SNF. But licensed nuclear reactors are expected to generate an additional 70,000 metric tons of SNF, at the least, over their commercial lifetimes.

In 1982, Congress passed the Nuclear Waste Policy Act ("NWPA"). The NWPA requires the Department of Energy to construct a permanent repository for the disposal of SNF. Pursuant to the terms of the NWPA, the Department of Energy entered into a contractual agreement with all utilities that control one or more nuclear reactors to accept the SNF generated by these reactors no later than January 31, 1998. However, the Department of Energy estimates that, at the earliest, it will not have a permanent repository to receive SNF until 2010.

A consortium of utility companies formed PFS as a temporary solution to the storage problem. PFS proposes to build an off-site, private SNF storage facility on a portion of the reservation of the Skull Valley Band in Utah. On May 20, 1997,

PFS entered into a lease of tribal reservation lands with the Skull Valley Band to allow the construction of a SNF storage facility. The BIA has conditionally approved the lease. PFS has submitted a license application to the NRC to construct and operate the proposed SNF storage facility. The NRC has yet to rule on PFS' application.

Not surprisingly, the State of Utah objects to PFS's proposal. Governor Leavitt proposed, and the Utah Legislature passed, five pieces of legislation ("Utah laws") directed at blocking Plaintiffs' proposed facility.[1] The Utah laws fall into three categories: (1) Part 3 of Utah's Radiation Control Act ("Part 3"), (2) the Additional Provisions, and (3) the Miscellaneous Provisions.[2]

## ANALYSIS

### I. JURISDICTION

In its motion for judgment on the pleadings and its suggestion of lack of jurisdiction under Rule 12(h)(3), Defendants argue that (1) Plaintiffs do not have standing because they do not allege a violation of a legally cognizable interest and (2) Plaintiffs' claims are not ripe because the NRC has yet to grant PFS a license for facility.

### A. STANDING

■■■ Article III of the Constitution restricts the federal courts to adjudicating actual "cases" or "controversies." U.S. CONST. art. III. The case-or-controversy limitation "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). To ensure judicial adherence to the case-or-controversy requirement, the federal courts have adopted a variety of doctrines, of which the "doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important." *Id.* Accordingly, Article III standing is a jurisdictional prerequisite. *Id.* at 754.

■■■ The party invoking federal jurisdiction has the burden to establish its standing to bring suit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In order to invoke federal jurisdiction, a party must demonstrate three things:

(1) injury in fact, by which [is] mean[t] an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, by which [is] mean[t] that the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, by which [is] mean[t] that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative.

*Northeastern Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (internal quotations and citations omitted).

Defendants argue that Plaintiffs have not shown an invasion of a legally protected interest, "because PFS has no right to conduct the business of a nuclear waste

---

**1.** Governor Leavitt and various representative's statements on the purpose and effect of the Utah laws can be found in Pls.' Mot. in Support of Joint Mot. for Summary Judgment ("Summary Judgment Mot.") at 17–24.

**2.** As discussed below, these three general categories include numerous subcategories.

dump prohibited by Congress, it has in this case no right capable of judicial enforcement." (Dfts.' Reply re Suggestion of Lack of Jurisdiction at 13). Defendants further contend that "the [NWPA] ... prohibits the storage of spent nuclear fuel from commercial nuclear power plants at an away-from-reactor storage facility, except in a Monitored Retrievable Storage facility owned and operated by the federal government pursuant to the NWPA." (Dfts.' Response to Pls.' Joint Mot. for Summary Judgment, App. 1 at 3). This argument is repeated, in various contexts, throughout Defendants' pleadings. The parties and the court have referred to this argument as the "lawfulness issue."

Defendants contend that in order to resolve the question of Plaintiffs' standing to bring this suit, the merits of the lawfulness issue must be resolved. That means, according to Defendants, that this court must decide whether Plaintiffs have a legal right to own and operate an off-site, private SNF facility. However, Plaintiffs are not asserting the right to own an off-site, private SNF facility in this lawsuit. What Plaintiffs claim here is that the Utah laws harm them by (1) hindering their licensing efforts before the NRC and by (2) creating uncertainty as to the utility of proceeding with their licensing efforts before the NRC. Thus, in this lawsuit, Plaintiffs seek to secure their right to proceed before the NRC in their licensing attempt free from state interference. The question of whether Plaintiffs have a right to own and operate a SNF facility will be resolved by the NRC (with the right of appeal to the appropriate Court of Appeals) and not by this court.

■ The question is then do Plaintiffs have a right recognized in law to seek a license from the NRC free from alleged state interference. The answer is clearly "yes." First, the Supremacy Clause grants a right to challenge a state law that allegedly conflicts with federal law, which is the gist of Plaintiffs' contention here: that the Utah laws are in conflict with federal laws that regulate nuclear waste. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

■ Second, whether the Plaintiffs will be successful in their effort to have the NRC grant them a license does not affect their legal right to make that effort. "Whether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits. Otherwise, every unsuccessful plaintiff will have lacked standing in the first place." *Claybrook v. Slater,* 111 F.3d 904, 907 (D.C.Cir. 1997); *see also Lujan,* 504 U.S. at 562–63, 112 S.Ct. 2130. Similarly, a person who is stopped and has his person searched by the police might ultimately lose a motion to suppress contraband that was seized during the search, but that person still has a right to challenge the search and seizure under the Fourth Amendment. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Likewise, a person has the right to sue for a government benefit under the Due Process Clause, such as a welfare benefit, even if that individual ultimately is found not entitled to the benefit. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

There are certain instances when a court may need to examine the merits of the underlying claim to determine whether a plaintiff asserts a legally protected interest. *See Hickman v. Block,* 81 F.3d 98, 101 (9th Cir.), *cert. denied,* 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996) (holding that because the Second Amendment did not guarantee an individual right to bear arms, plaintiff claimed only a gen-

eralized grievance and did not have standing to bring suit); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 898 (Fed.Cir.1989) (plaintiffs lacked standing because "the injury they assert is to a nonexistent right to continued importation of a Congressionally excluded product"). But that is not the situation here. This suit involves the Plaintiffs' constitutional right to seek a government benefit, a license from the NRC, free from allegedly preempted state laws. Their right to seek a license is not in doubt. Therefore, Plaintiffs have standing to challenge the Utah laws.

## B. RIPENESS

▮▮▮ "Whether a claim is ripe for adjudication, and therefore presents a case or controversy, bears directly on ... jurisdiction." *United States v. Wilson*, 244 F.3d 1208, 1213 (10th Cir.), *as corrected on reh'g* (May 10, 2001), *cert. denied*, 533 U.S. 962, 121 S.Ct. 2619, 150 L.Ed.2d 773 (June 29, 2001) (citing *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498–99 (10th Cir.1995)). The doctrine of ripeness is "intended to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *New Mexicans*, 64 F.3d at 1499. "In determining whether a claim is ripe", a court must look at "the fitness of the issue for judicial resolution and the hardship to the parties of withholding judicial consideration." *Id.*

### 1. *Fitness for resolution*

To determine whether an issue is fit for resolution, a court must determine whether the matter involves uncertain events which may not happen at all, and whether the issues involved are based on legal questions or factual ones. If there are factual issues that need further development, the matter might not be fit for resolution. *See id.*

Defendants argue that the case is not ripe for adjudication because "(1) Agency action [the NRC] (and inevitable judicial review thereof) has not yet given PFS a valid, lawful license; ... [and] (2) Agency action (and inevitable judicial review thereof) has not yet given PFS a valid, lawful lease...." (Dfts.' Suggestion re Lack of Jurisdiction at 8).

Again, Defendants' view of Plaintiffs' claims is incorrect. As discussed above, what Plaintiffs seek is the right to proceed before the NRC without interference from the Utah laws. They are now involved in that process. Whether the NRC ultimately grants or denies Plaintiffs a license is not material to this lawsuit. Therefore, there are no uncertain or contingent events which would render this case unfit for resolution

The issues presented in the motions are primarily legal ones, bearing on the questions of whether the Utah laws violate various Constitutional provisions and whether federal law has preempted the field. To the extent that factual issues play a role in these motions, as for example with the motion to dismiss, they are not in dispute as shown below.

### 2. *Hardship to Parties*

The question here is "whether the challenged action creates a 'direct and immediate' dilemma for the parties." *New Mexicans*, 64 F.3d at 1499 (internal citations omitted). The answer is "yes." Plaintiffs would face significant hardship if the constitutionality of the Utah laws was not resolved at this point. Plaintiffs allege three harms resulting from the Utah laws: (1) harm to their licensing efforts arising from Utah's reliance on the Utah laws in the NRC licensing procedures; (2) harm to their licensing efforts due to the uncertainty created by the Utah laws; and (3) harm to pre-construction operations. The court will discuss each in turn.

#### a. Harm to Plaintiffs' Licensing Efforts

The harm to Plaintiffs' licensing efforts with the NRC is concrete and immediate. In proceedings before the NRC, Defendants have pointed to the Utah laws' impact on the provision of municipal services to oppose the proposed facility. (State of Utah's Request for Admission of Late-Filed Contention Utah Security J, attached to Pls.' Response to Dfts.' Suggestion of Lack of Jurisdiction as Ex. A at 3–8). Utah argued to the NRC that "[t]he enactment of laws prohibiting a county from providing law enforcement services to a high level nuclear waste storage facility means that PFS does not have the performance capability to provide high assurance that its activity involving spent nuclear fuel does not constitute an unreasonable risk to public health and safety." (*Id.* at 7). Clearly, these provisions of the Utah laws subject Plaintiffs to immediate harm in the NRC licensing process.

#### b. Uncertainty Created by the Utah Laws

The Utah laws harm Plaintiffs by creating uncertainty about whether it is futile for them to attempt to obtain a license from the NRC. PFS has invested significant assets in seeking to construct and operate a SNF facility, including seeking a federal license before the NRC, negotiating contracts, and planning a spent nuclear fuel facility. Yet, if the Utah laws are constitutional, PFS' license from the NRC could be useless in fact.

As proclaimed by Governor Leavitt and reaffirmed on the Senate floor, the purpose of both Part 3 and the Additional Provisions is to prevent the construction and operation of a spent nuclear fuel facili-

ty. (Pls.' Summary Judgment Mot. at 17–24). The effect of the Utah laws justifies such rhetoric. The Utah laws strip PFS of limited liability, UTAH CODE ANN. § 19–3–318, impose an annual transaction fee of 75% on the gross value of all contracts not voided, *Id.* § 19–3–301(1), impose a $5 million dollar state license application fee, *Id.* § 19–3–308, impose a fee covering at least 75% of unfunded potential liability,[3] *Id.* § 19–3–319(3)(a), isolate the proposed site from connecting roads and railroad lines, *Id.* § 72–3–301, § 54–4–15(4), and encourage counties to refuse to provide basic municipal services, *Id.* § 17–27–102(2), § 17–27–301(3), § 17–27–303(4), 5(b) and (7), § 17–27–308, § 17–34–1(1). Each of these provisions increase the cost of operating a SNF facility to such a degree that more likely than not PFS would not proceed with the construction of the proposed facility.

Accordingly, the mere existence of the Utah laws creates uncertainty about future costs. PFS cannot make an informed decision regarding the economic desirability of proceeding with the licensing process and its general efforts. This uncertainty is an immediate and significant hardship. *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock,* 93 F.3d 68, 72 (2nd Cir.1996); *see also Pac. Gas,* 461 U.S. at 201–02, 103 S.Ct. 1713 (plaintiffs' challenge was ripe because "[t]o require the industry to proceed without knowing whether the [state law] is valid would impose a palpable and considerable hardship on the utilities").

#### c. Current Costs of the Statutes

Finally, Plaintiffs argue that PFS faces pre-operation costs as a result of the Utah

---

**3.** Unfunded potential liability estimates range from $14 to $313 billion dollars. (*Hearings on S.B. 81 before the Energy, Natural Resources and Agriculture Standing Comm.,* Utah State Sen., Feb 15, 2001, attached to Pls.' Summary Judgment Mot., Att. 3 (Statement of Dianne Nielson, Executive Director of the Utah Department of Environmental Quality)).

laws. The Utah laws void any contract to which PFS or the Band is a party, § 19–3–301(1), and impose civil and criminal penalties on those who facilitate violations of the regulatory scheme, *Id.* § 19–3–312. From this, Plaintiffs argue that they suffer actual harm at this moment.

The real injury of these provisions, however, is not their direct harm, that is, the cost of the contract or penalty clause today. In fact, Plaintiffs allege no specific costs already incurred during this pre-operation phase as a result of the Utah laws. Rather, the harm to PFS is the cost of not being able to anticipate future costs, as described above. The harm from uncertainty is not limited to any particular section of the Utah laws, because each provision acts to potentially increase costs.

 Because the issues turn on purely legal issues and PFS faces a direct and immediate harm, the matter is ripe for judicial review.

## II. JOINT MOTION FOR SUMMARY JUDGMENT

### A. STANDARD OF LAW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In applying this standard, the court must construe all facts and reason-

able inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pueblo of Santa Ana v. Kelly,* 104 F.3d 1546, 1552 (10th Cir.), *cert. denied,* 522 U.S. 807, 118 S.Ct. 45, 139 L.Ed.2d 11 (1997).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Gonzales v. Millers Cas. Ins. Co.,* 923 F.2d 1417, 1419 (10th Cir.1991). The non-moving party must set forth specific facts showing a genuine issue for trial; mere allegations and references to the pleadings will not suffice. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. PREEMPTION

 The Supremacy Clause, U.S. CONST. art. VI, cl. 2, elevates federal law above that of the states. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 92–93, 6 L.Ed. 23 (1824).[4] Accordingly, the Supremacy Clause mandates that federal law preempts any state regulation of any area over which Congress has exercised exclusive authority, so long as it acts within its constitutionally delimited powers. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 236, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947); *M'Culloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 427, 4 L.Ed. 579 (1819). Congress may exercise its exclusive authority

---

**4.** The Supremacy Clause provides that: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

and thereby preempt State law in either of two general ways: (1) if Congress evidences an intent to occupy a given field, any state law falling within that field is preempted; or (2) if Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (citations omitted). Courts infer Congressional intent to occupy a given field from either explicit preemptive language or impliedly from a "scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it." *Pac. Gas*, 461 U.S. at 203–04, 103 S.Ct. 1713 (citations omitted).

In areas that Congress decides require national uniformity of regulation, Congress may exercise power to exclude any state regulation, even if harmonious. *DeCanas v. Bica*, 424 U.S. 351, 356, 359, n. 7, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). As the Court has made clear, "[s]tate safety regulation is not preempted only when it conflicts with federal law. Rather, the federal government has occupied the entire field of nuclear safety concerns...." *Pac. Gas*, 461 U.S. at 212, 103 S.Ct. 1713.[5] Where Congress has occupied an entire field, "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230, 67 S.Ct. 1146; *English*, 496 U.S. at 79, 110 S.Ct. 2270. Therefore, as the federal government has occupied the field of nuclear safety, any state law on the same subject, even if harmonious with federal law is preempted and invalid.[6]

### 1. Preemption of the Regulation of Nuclear Safety

The first question is what has Congress preempted in its scheme of federal regulation. Congress enacted the Atomic Energy Act ("AEA") in 1954 to promote the development of atomic energy for peaceful purposes under a program of federal regulation and licensing. *Pac. Gas*, 461 U.S. at 206–07, 103 S.Ct. 1713. Under the AEA, this policy decision is advanced by opening the door to private construction, ownership, and operation of commercial nuclear-power reactors under the strict supervision of the Atomic Energy Commission ("AEC"). *English v. General Elec. Co.*, 496 U.S. 72, 81, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 63, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). The AEC was given exclusive authority to license the transfer, delivery, receipt, acquisition, possession, and use of all nuclear materials. *English*, 496 U.S. at 81, 110 S.Ct. 2270. "Upon these subjects, no role was left for the states." *Pac. Gas*, 461 U.S. at 207, 103 S.Ct. 1713. In 1974, Congress abolished the AEC and transferred its regulatory and licensing authority to the NRC. 42 U.S.C. § 5841(f) (1982 ed.); *English*, 496 U.S. at 81, 110 S.Ct. 2270.

The Supreme Court in *Pacific Gas* was faced with the question of whether a California law that imposed "a moratorium on the certification of new nuclear power plants until the Energy Commission finds that there has been developed and that the United States ... has approved and there exists a demonstrated technology or means for the disposal of a high-level

---

**5.** The court notes that *Pacific Gas* remains good law, which this court must faithfully follow. *Pacific Gas* was decided after the NWPA became law in 1982. Therefore, the passage of NWPA does not effect the Supreme

Court's holding that the AEA preempted the entire field of nuclear safety.

**6.** This renders Defendants' lawfulness argument irrelevant.

nuclear waste." 461 U.S. at 198, 103 S.Ct. 1713. The Court examined the relevant statutory provisions and legislative history of the AEA and concluded that "Congress ... intended that the federal government regulate the radiological safety aspects involved ... in the construction and operation of a nuclear plant." *Id.* at 205, 103 S.Ct. 1713. The Court concluded that "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." *Id.* at 212, 103 S.Ct. 1713. However, in *Pacific Gas,* the Court went on to evaluate the California statute at issue and found that it did not fall within the pre-empted field, because Congress intended that "the Federal Government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant" and not the economic decision of whether to construct one. *Id.* at 205, 103 S.Ct. 1713. The decision in *Pacific Gas* makes clear that while Congress has preempted the entire field of nuclear safety, it has not preempted all areas which relate to nuclear power.

### 2. *Utah Laws*

■■■■ The next question is whether the Utah laws fall within the scope of the preempted field of nuclear safety regulation. The Utah Laws fall into three general categories: (1) Part 3, (2) Additional Provisions and (3) Miscellaneous Provisions.[7] To determine whether these laws fall within the pre-empted field, a court is guided, in part, by examining "the motivation behind the law"[8] and in part "by the state law's actual effect on nuclear safety." *English,* 496 U.S. at 84, 110 S.Ct. 2270. However, "a finding of safety motivation [is not] necessary to place a state law

within the pre-empted field." *Id.* Instead, "[f]or a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *Id.* at 85, 110 S.Ct. 2270. "Regulation of matters directly affecting the radiological safety of nuclear-plant construction and operation, 'even if enacted out of nonsafety concerns, would nevertheless [infringe upon] the NRC's exclusive authority.'" *Id.* at 84, 110 S.Ct. 2270 (quoting *Pac. Gas,* 461 U.S. at 212, 103 S.Ct. 1713).

#### a. Part 3

Part 3 has two main components. First, Part 3 establishes a separate, state licensing process for SNF storage. UTAH CODE ANN. §§ 19–3–301, *et seq.* Second, Part 3 revokes statutory and common-law limited liability for any officer or director of the operator of a SNF facility and any holder of an equity interest in the operator of the SNF facility. *Id.* § 19–3–318.

#### i. Separate State Licensing Process

Part 3 establishes a separate, state licensing process for SNF storage as illustrated by the following provisions. The stated purpose of Part 3 is to "regulate transportation, transfer, storage, decay in storage, treatment, and disposal of any high-level nuclear waste." *Id.* § 19–3–302. To implement that stated goal, Part 3 authorizes the issuance of regulations "necessary for the protection of the public health," including "rules for safe and proper construction, ... use, and operation of ... storage facilities." *Id.* § 19–3–304(3)(a). Part 3 also establishes numer-

---

**7.** Plaintiffs challenge the Miscellaneous Provisions as violative of only the Commerce Clause and therefore, these provisions will be analyzed in that section of this decision.

**8.** It is not clear to what extent improper motive matters. *English,* 496 U.S. at 84, 84 n. 7, 110 S.Ct. 2270; *Pacific Gas,* 461 U.S. at 216, 103 S.Ct. 1713.

ous regulations. *Id.* § 19–3–301(1) (subjecting the placement and transportation of SNF to the specific approval of the Governor and Legislature, final judicial approval, and the satisfaction of additional criteria); *id.* § 19–3–304 (prohibiting the construction and operation of a SNF storage facility without a license from the State Department of Environmental Quality ("DEQ")). For example, under the state licensing scheme, an applicant must provide analyses of groundwater conditions, *id.* § 19–3–305(1), § 19–3–307(2), a security plan, *id.* § 19–3–305(7), health risk assessments, *id.* § 19–3–305(10), a quality assurance program, *id.* § 19–3–305(12), a radiation safety program, *id.* § 19–3–305(12), and an emergency plan, *id.* § 19–3–305(13). An applicant must also demonstrate that the facility "will not cause or contribute to an increase in mortality, an increase in illness, or pose a present or potential hazard to human health or the environment." *Id.* § 19–3–306(3). An applicant must enter into a benefits agreement with the DEQ to "offset adverse environmental public health, social and economical impacts." *Id.* § 19–3–310. Any transportation of SNF must meet with the approval from the State Department of Transportation. *Id.* § 19–3–315. To apply, an applicant must pay an initial non-refundable application fee of five million dollars, over and above the costs of reviewing the application. *Id.* § 19–3–308; 19–3–309 (establishing that fees collected under § 308 will be deposited into specific accounts to fund Utah's duties under Part 3). Moreover, a permitee (one who has received a license) must agree to pay the State an amount equal to at least 75% of the "unfunded potential liability" of the project. *Id.* § 19–3–319. A license is limited to a term of twenty years and may be extended only by approval of the Governor, Legislature and DEQ. *Id.* § 19–3–311. Any person who violates or facilitates violations of Part 3,

except for Utah-based nonprofit trade associations, can face civil and criminal penalties. *Id.* § 19–3–312.

■ Clearly, the above described provisions of Part 3 establish a state licensing scheme for SNF storage and transportation. This state licensing scheme duplicates the NRC's licensing procedure in significant ways. Both licensing processes require an emergency plan, an environmental report, a safety-analysis report, and financial disclosure. *Compare Id.* § 19–3–301, *et seq. with* 10 C.F.R. Part 72. In sum, Part 3 attempts to regulate areas which are covered by the AEA and, therefore, is preempted. *See United States v. Commonwealth of Kentucky*, 252 F.3d 816, 824 (6th Cir.), *cert. denied,* — U.S. —, 122 S.Ct. 396, 151 L.Ed.2d 300 (2001) ("Because the challenged permit conditions regulate materials covered by the AEA, they are therefore preempted.").

ii. Limited–Liability

■ Part 3 also includes § 19–3–318 which revokes statutory and common-law limited liability for any officer or director of the operator of a SNF facility and any holder of an equity interest in the operator of the SNF facility. PFS is a limited liability corporation with directors and officers. With no limit on their potential liability, these individuals would face substantial risk if PFS actually transported and stored SNF in Utah. Utah has estimated the "unfunded potential liability" of PFS to be between $14 and $313 billion dollars. (*Hearings on S.B. 81 before the Energy, Natural Resources and Agriculture Standing Comm.*, Utah State Sen., Feb 15, 2001, attached to Pls.' Summary Judgment Mot., Att. 3 (Statement of Dianne Nielson, Executive Director of the Utah Department of Environmental Quality)). Such individual risk would more likely than not have the effect of preventing the construction and operation of a SNF

storage facility. At the least, there would be an additional, substantial cost of insurance to officers, directors, and PFS, and a corresponding effect on the safety measures employed by the facility. Therefore, § 19–3–318 directly and substantially affects the decisions made by those who build or operate nuclear facilities concerning radiological safety levels. Under *English*, such a law falls within the preempted field. *English*, 496 U.S. at 85, 110 S.Ct. 2270.

iii. Economic and Environmental Concerns

Defendants argue that in passing Part 3, Utah intended to address Utah's economic and environmental concerns resulting from the transportation and storage of radiological and non-radiological waste. The legislative purpose statement does include the following language: "thereby asserting and protecting the state's interests in environmental and economic resources." UTAH CODE ANN. § 19–3–302. A state, as a regulator of electric power, may consider the possibility of additional costs to nuclear energy to the state and decide not to proceed with nuclear power as an electricity option as long as those costs existed. *Pac. Gas*, 461 U.S. at 213–16, 103 S.Ct. 1713. However, a state may not regulate matters directly affecting the radiological safety of nuclear-facility construction "even if [the legislation was] enacted out of nonsafety concerns." *English*, 496 U.S. at 84, 110 S.Ct. 2270 (internal quotation omitted). Because, as discussed above, Part 3 regulates matters directly affecting radiological safety of nuclear-facility construction,

Part 3 falls within the preempted field, regardless of its claimed motivation.

In any event, the actual motivation behind Part 3 was radiological safety concerns. Defendants argue that Utah's refusal to store SNF is based upon its concern in maintaining property values around the rail corridors and preventing costly environmental damage. These concerns result directly from a fear of the radiological hazards of SNF. Property values would be affected because of the possibility of a radiological disaster. Costly environmental damage resulting from the transport of SNF would result only from a radiological disaster. Such expressions of state economic interest based on concerns of radiological safety fall within the field preempted by the AEA. *See Pac. Gas*, 461 U.S. at 213, 103 S.Ct. 1713 ("A state moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field.")

 Similarly, Utah's environmental concerns arise from radiological safety issues. Environmental concerns could stem from either radiological or non-radiological waste. "While federal law does not preempt state regulation of solid waste, states may not regulate the radioactive component of solid waste." *Commonwealth of Kentucky*, 252 F.3d at 824. Utah's regulations do not discriminate between the radiological and non-radiological waste. Moreover, there is no indication that the non-radiological waste is severable from the radiological waste. Therefore, federal law preempts Utah laws that arise from both radiological and non-radiological environmental concerns.[9] *Id.*

---

9. Part 3 contains a severability clause. UTAH CODE ANN. § 19–3–317. "A severability clause, . . ., creates a presumption that the legislature would have been satisfied with the remaining portions of the enactment." *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236, 2002 WL 1277943, \* 7 (10th Cir.2002) (unpublished)

(citing *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1291 (10th Cir.2002)). The preemption discussion did not deal with UTAH CODE ANN. §§ 19–3–302, 303, or 317. These provisions, however, are general provisions detailing the purpose of the laws, definitions,

#### b. Additional Provisions

The Additional Provisions fall into two sub-categories, Road Provisions and County Planning Provisions. Sections 54–4–15(4), 72–3–301, 72–4–125(4), and 78–34–6(5) are referred to as the Road Provisions, while §§ 17–27–102(2), 17–27–301(3), 17–27–303(4), (5)(b), and (7), 17–27–308, 17–34–1(1) and (3), 17–34–6, 34–38–3(2), are referred to as the County Planning Provisions. (Dfts.' Response to Joint Mot. for Summary Judgment at 24). As discussed above, the court must examine the motivation behind and effect of the Additional Provisions to determine whether they fall within the field of radiological safety.

#### i. Road Provisions

Defendants argue that the Road Provisions are proper exercises of state authority because "none of the statutes, on its face, is anything other than an obviously lawful exercise of Utah's power to legislate with respect to the roads in the State." (Dfts.' Response to Joint Mot. for Summary Judgment at 25). However, the relevant inquiry goes beyond the statute's language. *See English,* 496 U.S. at 84–85, 110 S.Ct. 2270.

The Road Provisions give Governor Leavitt veto power over possible routes to the proposed SNF facility. Section 54–4–15 gives the Governor and the State Legislature the effective power to veto any decision of the Utah Department of Transportation that grants permission to build a railroad across a public road or highway to be used to transport SNF. Section 72–3–301 designates certain county gravel and dirt roads and trails near the Skull Valley Reservation as statewide public safety highways. Section 72–4–125(4) removes control of Skull Valley Road (the only road permitting access to the Skull Valley Reservation and PFS' proposed facility) from the county by designating it a state highway. Section 78–34–6(5) alters the procedures for the exercise of eminent domain to obtain a right of way, so that if a right of way is sought for transportation of SNF, the applicant must have the permission of the Governor and concurrence of the Legislature. Each of these provisions condition the construction or operation of a route to PFS' proposed facility on the Governor's consent. This veto right builds the equivalent of a "moat" around the proposed site.

 This metaphorical "moat" more likely than not would prevent the construction of PFS' proposed SNF facility. PFS will not be able to transport SNF to the proposed site without the approval of Governor Leavitt. Yet, Governor Leavitt has made clear that he will not allow SNF into Utah if possible.[10] Without a railroad spur

and severability. Because these provisions cannot stand on their own, they are preempted as well. On the other hand, the Miscellaneous Provisions address different topics and are clearly severable.

10. Governor Leavitt explained the purpose behind the Road Provisions: "Signing these bills [including S.B. 78 and 196] will add substantially to our ability as a state to protect the health and safety of our citizens against the storage of high-level nuclear waste." (*New road sign to Skull Valley a show of force,* Deseret News, Mar. 22, 1998, attached to Pls.' Summary Judgment Mot. at Att. 28). Likewise, Senator Peter Knudson explained that "[s]ome have referred to this as the 'moat'

around Skull Valley and the purpose of this bill is to put under state control these public safety interest highways to preclude rail spurs traversing across them." (*Floor Debate of S.B. 164,* Utah State Sen., Feb. 22, 1999, attached to Pls.' Summary Judgment Mot. at Att. 31). Senator Peter Knudson also explained that: "[t]his [S.B. 164] would prevent bringing those rods by railroad into Skull Valley as the state would have jurisdiction over these highways." (*Floor Debate of S.B. 164 before the Utah State Senate,* Feb. 19, 1999, attached to Pls.' Summary Judgment Mot. at Att. 29). Or, as Deputy Director Clint Topham explained: "So in all reality, the physical condition, the physical makeup of

or road to transport waste to the proposed facility, the proposed SNF storage facility is useless and would not be built. By creating a de facto bar to the construction of PFS' proposed SNF facility, the Road Provisions directly and substantially affect the decisions made by those who build or operate nuclear facilities concerning radiological safety levels and fall within the preempted field.

### ii. County Planning Provisions

■ The County Planning Provisions fall into two categories: county regulation and municipal services. Section 17–27–102(2), 301(3), 303(4), 303(5)(b), and 303(7) give a county two options: (1) it may choose to allow SNF in its borders, as long as it includes in its general plan specific provisions that address the effects of a proposed SNF site upon the health and general welfare of citizens of the State, provide information pursuant to the state licensing scheme, and hold public hearings and comment before any proposal's adoption; or (2) it may reject all SNF storage facility proposals. UTAH CODE ANN. § 17–27–301(3). These provisions require a county to involve itself in the state licensing scheme by collecting information and by adopting "specific measures to mitigate the effects of high-level nuclear waste and greater than class C radioactive waste and guarantee the health and safety of the citizens of the state." *Id.* § 17–27–301(3)(a)(i–iii). In other words, the county must adopt provisions that regulate or facilitate the regulation of a SNF storage facility. Because a state or its political

subdivisions may not regulate the licensing of SNF, these statutes fall within the field preempted by the AEA.

■ Under the County Planning Provisions, a county may not "provide, contract to provide, or agree in any manner to provide municipal-type services ... to any area under consideration for a storage facility or transfer facility for the placement of high-level nuclear waste, or greater than class C radioactive waste." UTAH CODE ANN. § 17–34–1(3). A refusal to provide municipal services would drastically increase PFS' cost of operation, because the SNF facility would have to provide its own emergency services. Additionally, such a bar threatens PFS' application before the NRC. The NRC evaluates whether the proposed site would constitute an unreasonable risk to public health and safety, and, as discussed earlier, Utah has argued that "[t]he enactment of laws prohibiting a county from providing law enforcement services to a high level nuclear waste storage facility means that PFS does not have the performance capability to provide high assurance that its activity involving spent nuclear fuel does not constitute an unreasonable risk to public health and safety." (State of Utah's Request for Admission of Late-Filed Contention Utah Security J, attached to Pls.' Response to Dfts.' Suggestion of Lack of Jurisdiction as Ex. A at 3–7). This municipal service provision has a direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels and, thus, fall within the preempted field.[11] *English,* 496 U.S. at 84,

the way these roads are maintained and the way the counties would get funding for these roads does not change under this bill. It only allows for us to control whether or not a railroad would cross it and keeps the county from abandoning it." (*Hearings on S.B. 164 before the Senate Transportation and Public Safety Standing Comm.,* Utah State Sen., Feb. 16, 1999, attached to Pls.' Summary Judg-

ment Mot. at Att. 30). Clearly, Governor Leavitt will follow through with his policy statement: "Our policy is simple: we don't want it [SNF]." (Pls.' Summary Judgment Mot. at Att. 12).

**11.** The state of Utah also agrees to indemnify a county for refusing to provide municipal services or refusing to site a SNF storage

110 S.Ct. 2270.

### c. Conclusion

Because the federal government has completely occupied the field of radiological safety, the only question is whether " 'the matter on which the state asserts the right to act is in any way regulated by the federal government.' " *Pac. Gas,* 461 U.S. at 212–13, 103 S.Ct. 1713 (quoting *Rice,* 331 U.S. at 236, 67 S.Ct. 1146). As Representative Stephen H. Urquhart explained for S.B. 81, but which holds true for each provision of Part 3 and the Additional Provisions: "[t]he bill takes three actions first, in case there is any question, it clearly states that we do not want this material within the state and we prohibit it. Second, ... the bill challenges the authority of the [NRC] to license a private entity to move and store this waste within our state. Third, should we lose the licensing battle, the bill creates a licensing process." (*Floor Debate of Second Substitute Senate Bill 81,* the Utah State House, Feb. 28, 2001, attached to Pls.' Summary Judgment Mot. at Att. 24). Clearly, Utah may not prevent radiological waste from entering Utah because of safety concerns. Nor may Utah create a separate, state licensing process for SNF. Therefore, Part 3 and the Additional Provisions are preempted by the AEA.[12]

### C. COMMERCE CLAUSE

The Miscellaneous Provisions consist of §§ 34–38–3(2) and 73–4–1(2). Plaintiffs challenge these remaining two provisions only under the Commerce Clause. (Pls.' Summary Judgment Mot. at 15 n. 6). Section 34–38–3(2) provides for mandatory drug and alcohol testing program for all employees of any entity engaged in the transportation or storage of SNF. Section 73–4–1(2) allows the initiation of litigation to determine any water rights for any area under consideration for SNF facility.

The Commerce Clause not only grants Congress an express authority to override restrictive and conflicting commercial regulations adopted by a state, it curtails state power through negative implication. *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,* 520 U.S. 564, 571–72, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). When the Commerce Clause operates through negative implication, it is generally referred to as the dormant Commerce Clause. The Tenth Circuit explained the law of the dormant Commerce Clause in *Dorrance v. McCarthy:*

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. The person challenging a statute that regulates evenhandedly bears the burden of showing that the incidental burden on interstate commerce is excessive compared to the local interest. By contrast, if a statute discriminates against interstate commerce either on its face or in its practical effect, it is

---

facility. Utah Code Ann. §§ 17–27–308, 17–34–6. Because these statutes encourage the counties to act in accordance with the preempted County Planning Provisions, these provisions are also struck down.

12. Because Part 3 and the Additional Provisions violate the Supremacy Clause, the court need not address their constitutionality under any other constitutional provision.

subject to the strictest scrutiny, and the burden shifts to the governmental body to prove both the legitimacy of the purported local interest and the lack of alternative means to further the local interest with less impact on interstate commerce. Thus, where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected.

957 F.2d 761, 763 (10th Cir.1992) (internal citations and quotation omitted). "The crucial inquiry, therefore, must be directed to determining whether [the challenged laws are] basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey*, 437 U.S. 617 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). The purpose of the law is not important "because the evil of protectionism can reside in legislative means as well as legislative ends." *Id.* at 626, 98 S.Ct. 2531. This is to say that whatever the a legislature's ultimate purpose, "it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Id.* at 626–27, 98 S.Ct. 2531.

Defendants argue that there cannot be discrimination against an out-of-state interest unless (1) out-of-state interests are burdened and (2) local economic actors are favored. (Dfts.' Response to Joint Mot. for Summary Judgment at 18). However, the case law does not support Defendants' argument. In *City of Philadelphia*, the Court declared that "[w]hat is crucial is the attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of

interstate trade." *Id.* at 628, 98 S.Ct. 2531. Therefore, it did not matter whether "[n]o New Jersey commercial interests st[ood] to gain advantage over competitors from outside the state as a result of the ban on dumping out-of-state waste." *Id.* at 626, 98 S.Ct. 2531.

■ Based on these legal principles, the question is then whether the Utah laws are for protectionist reasons or legitimate concerns with a secondary effect on commerce. Section 34–38–3(2) provides for mandatory drug and alcohol testing. This provision does not bar SNF from Utah. Rather, it has an indirect effect on operating costs of a SNF facility, because to comply with the statute, PFS would have to implement a drug testing program. It may also indirectly effect employee recruitment, because certain employees may refuse to subject themselves to such testing. However, these effects are indirect and incidental and do not outweigh the important local safety concerns. Therefore, the drug testing provision does not violate the Commerce Clause.

■ Section 73–4–1(2) permits the executive director of the Department of Environmental Quality, with the concurrence of the governor, to request that the state engineer file an action to determine water rights in the area of a proposed SNF facility. Previously, local individuals had to request the state engineer to file suit. The provision seeks to determine water rights immediately, so that Utah and PFS know their respective rights to groundwater. Any effect on interstate commerce is incidental and indirect. Further, the local benefit of definite rights to a precious resource outweigh the slight effect on interstate commerce. Therefore, the groundwater provision does not violate the Commerce Clause.[13]

---

13. Because the court has decided the matter on Supremacy Clause and Commerce Clause grounds alone, the court will not reach Plain-

tiffs' other constitutional arguments, including the Skull Valley Band's motion for summary judgment.

### III. MOTION TO DISMISS COUNTERCLAIMS

■ Plaintiffs also move to dismiss Defendants' counterclaims.[14] Defendants argue only that they raised these counterclaims to raise standing and ripeness issues. (Dfts.' Response to Mot. to Dismiss at 3). As discussed above, Plaintiffs have standing and the issues are ripe for review. To the extent that these counterclaims exist only to raise justiciability arguments, they are not counterclaims in fact and are moot. To the extent that these counterclaims do raise actual claims, they can be disposed of quickly.

■ Plaintiffs argue that Counterclaims 1 and 2 fail as a matter of law because the court lacks jurisdiction to hear those claims. Counterclaim 1 alleges that the NRC has no authority to license a private, for profit, off-site SNF storage facility. Counterclaim 2 alleges that an NRC license will necessarily violate the NEPA and therefore be invalid. Pursuant to the Administrative Orders Review Act ("Hobbs Act"), 28 U.S.C. §§ 2342–51, the proper forum for the review of issues concerning the NRC's authority to license the proposed PFS facility or the propriety of such a license is the federal courts of appeals. 28 U.S.C. § 2342; *Environmental Defense Fund v. U.S. Nuclear Regulatory Comm'n*, 902 F.2d 785, 786 (10th Cir. 1990) ("petitions to compel final agency action which would only be reviewable in the United States Courts of Appeal are also within the exclusive jurisdiction of a United States Court of Appeals") (citations and quotations omitted); *New Jersey Dep't of Envtl. Prot. and Energy v. Long Island Power Authority*, 30 F.3d 403, 412–13 (3d Cir.1994) (claim properly dismissed from district court where NEPA challenge concerning two agencies would effectively challenge NRC final order); *City of West Chicago v. United States Nuclear Regulatory Comm'n*, 542 F.Supp. 13, 15 (N.D.Ill. 1982) (plaintiffs' claims concerning issuance of an environmental impact statement dismissed because license amendment had not yet been issued and once issued "review is proper before the court of appeals"). Defendants may and have challenged the lawfulness of the proposed facility in the NRC licensing process, and all parties have the right to appeal the NRC's decision to the appropriate court of appeals. Because the court does not have jurisdiction to decide the lawfulness issue, Counterclaims 1 and 2 fail as a matter of law.

■ Counterclaim 3 claims that Skull Valley Band has not lawfully approved the lease. Plaintiffs argue that Counterclaim 3 fails as a matter of law because Defendants lack standing to bring the claim. A plaintiff must suffer an "injury in fact" to have standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Here, Plaintiffs allege no personal injury. Any potential injury from an invalid lease would be suffered by the Skull Valley Band members or PFS, the parties to the lease. Utah has no role in protecting the Skull Valley Band or PFS. Therefore, counterclaim 3 fails as a matter of law.

---

**14.** Defendants argue that because Plaintiffs filed a response pleading to the Amended Counterclaims, the court should deny the motion to dismiss. However, to the extent that the motion is incorrectly styled, the court considers it as a motion for judgment on the pleadings under Rule 12(c). And, "[a] motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir.2000). Dismissal under either rule is appropriate "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." *Id.* (citations and quotations omitted).

Counterclaim 4 alleges that the conditional approval of the lease by the BIA occurred in violation of governing laws and rules, and counterclaim 5 alleges that any BIA approval of the lease will be invalid as a breach of the Government's trust obligation. Plaintiffs argue that Counterclaims 4 and 5 are barred by the doctrines of res judicata and collateral estoppel. The Court of Appeals for the Tenth Circuit held that the State's action challenging the BIA approval process was not ripe for adjudication, because "[w]e cannot be certain whether the [environmental impact statement] will show that the project presents unacceptable risks, whether the NRC will issue a license to PFS, or ... the precise activities which may be permitted on the leased lands." *Utah v. United States Dep't of the Interior ("Utah II"),* 210 F.3d 1193, 1197 (10th Cir.2000). Collateral Estoppel typically requires: (1) a valid final judgment on the issue; (2) identity of the party against whom the earlier decision is asserted and (3) and identity of issues raised in the successive proceedings. *SIL–FLO, Inc. v. SFHC,* 917 F.2d 1507, 1520 (10th Cir.1990). Those elements are met here.

The Tenth Circuit's decision is a final judgment on ripeness for the purposes of collateral estoppel. Dismissals for want of justiciability preclude relitigation of the very issue of justiciability actually determined. 18A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE, § 4436 (1981). Therefore, the Tenth Circuit's ripeness decision is final, absent a change in factual circumstances relating to the ripeness issue. *Solar v. Merit Sys. Protection Bd.,* 600 F.Supp. 535, 536 (S.D.Fla.1984). Defendants have pointed to no change of circumstance, nor can they, because the NRC still has not completed its review of the NRC application.

The identity of the party against whom the earlier decision is asserted is the same. In *Utah II,* the plaintiff was the State of Utah. Here, the Defendants are the Governor and Attorney General of Utah, who sue in their official capacities. "Litigation involving the government is generally binding with respect to governmental officials who are sued in their official capacities in later actions." *Headley v. Bacon,* 828 F.2d 1272, 1279 (8th Cir.1987) (citation omitted).

■ This case involves identical issues to *Utah II.* The identity of issues is established by reviewing the record to determine if the same issues were raised in the prior proceedings. *Montana v. United States,* 440 U.S. 147, 156, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). In *Utah II,* the State sought to intervene to contest what the State asserted to be the BIA's failure to consider certain environmental and safety factors in the ongoing lease approval process. 210 F.3d at 1196. In this suit, Defendants want the court to reach the issue of whether the BIA conditional approval of the lease occurred in violation of governing laws and rules and whether any BIA approval of the lease will be invalid as a breach of the Government's trust obligation. Both cases involve the BIA approval process. And, as before, the court "cannot be certain whether the [environmental impact statement] will show that the project presents unacceptable risks, whether the NRC will issue a license to PFS, or ... the precise activities which may be permitted on the leased lands." *Id.* at 1197. Therefore, counterclaims 4 and 5 are precluded under collateral estoppel.

## *ORDER*

For the above stated reasons, Defendants' motion for judgment on the pleadings and suggestion of lack of jurisdiction

are DENIED, and Plaintiffs' joint motion for summary judgment and motion to dismiss counterclaims are GRANTED.