**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 4 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

THE SKULL VALLEY BAND OF
GOSHUTE INDIANS and PRIVATE
FUEL STORAGE, L.L.C.,

      Plaintiffs-
      Counterdefendants-
      Appellees,

      v.

DIANNE R. NIELSON, in her official
capacity as Executive Director of the
Utah Department of Environmental
Quality; THOMAS WARNE, in his
official capacity as Executive Director
of the Utah Department of
Transportation; GLEN EDWARD
BROWN, in his official capacity as
Commissioner of the Utah Department
of Transportation; STEPHEN M.
BODILY, in his official capacity as
Commissioner of the Utah Department
of Transportation; HAL
MENDENHALL CLYDE, in his
official capacity as Commissioner of
the Utah Department of
Transportation; DAN R. EASTMAN,
in his official capacity as
Commissioner of the Utah Department
of Transportation; SHERI L.
GRIFFITH, in his official capacity as
Commissioner of the Utah Department
of Transportation; JAMES GREY
LARKIN, in his official capacity as
Commissioner of the Utah Department
of Transportation; TED D. LEWIS, in

No. 02-4149

his official capacity as Commissioner of the Utah Department of Transportation,

Defendants-Appellants,

and

MICHAEL O. LEAVITT, in his official capacity as Governor of the State of Utah; MARK L. SHURTLEFF, in his official capacity as Attorney General of the State of Utah,

Defendants-Counterclaimants-Appellants,

UNITED STATES OF AMERICA,

Amicus Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:01-CV-270-C)**

Tim Vollmann, Albuquerque, New Mexico (James A. Holtkamp, of LeBoeuf, Lamb, Greene & Mac Rae, Salt Lake City, Utah with him on the briefs), for the Plaintiff-Counterdefendant-Appellee Skull Valley Band of Goshute Indians.

Val R. Antczak ( J. Michael Bailey and H. Douglas Owens, Parsons, Behle & Latimer, Salt Lake City, Utah, and Jay E. Silberg, Shaw Pittman, LLP, Washington, D.C., with him on the briefs), Parsons, Behle, and Latimer, Salt Lake City, Utah, for the Plaintiff-Counterdefendant-Appellee Private Fuel Storage.

Thomas R. Lee, Howard, Phillips, and Andersen, Salt Lake City, Utah (Monte N. Stewart, Special Assistant Attorney General, Helen A. Frohlich, Assistant Attorney General, and Mark L. Shurtleff, Attorney General, Office of the Attorney General, Salt Lake City, Utah, with him on the briefs), for the Defendants-Appellants Nielson, Warne, Brown, Bodily, Clyde, Eastman, Griffith, Larkin, and Lewis; and the Defendants-Counterclaimants-Appellants Leavitt and Shurtleff.

Maureen E. Rudolph, Attorney, (Thomas L. Sansonetti, Assistant Attorney General, with her on the brief) United States Department of Justice, Environmental and Natural Resources Division, Washington, D.C., for the United States of America, Amicus Curiae.

---

Before **SEYMOUR** , **HENRY** , and **MCCONNELL,** Circuit Judges.

---

**HENRY,** Circuit Judge.

---

The Governor and Attorney General of Utah, along with Utah environmental and transportation officials, appeal the district court's ruling that the state's statutes regulating the storage and transportation of spent nuclear fuel are preempted by federal law. See Skull Valley Band of Goshute Indians v. Leavitt, 215 F. Supp. 2d 1232 (D. Utah 2002). The Utah officials argue that the district court should not have reached the merits of this dispute because (1) the plaintiffs who challenge the statutes–a consortium of utility companies (Private Fuel Storage, Inc.) and an Indian tribe (the Skull Valley Band of Goshute Indians)–lack standing to bring this lawsuit and (2) the case is not ripe for review.

Alternatively, the Utah officials argue that the majority of the challenged statutes are not preempted.

We agree with the district court's resolution of the standing question. Private Fuel Storage (PFS) and the Skull Valley Band have properly asserted that their legally protected interests have been injured by the challenged statutes and that these injuries are likely to be redressed by a favorable decision. Moreover, in light of the D.C. Circuit's recent resolution of the Utah officials' challenge to federal statutes and regulations concerning spent nuclear fuel, see Bullcreek v. Nuclear Regulatory Commission, 359 F.3d 536 (D.C. Cir. 2004), we further conclude that the case is now ripe for review.

On the merits, we agree with the district court's ruling that the Utah statutes are preempted by federal law. We therefore affirm the district court's decision.

## I. BACKGROUND

This case is one of many arising out the vexing problem of transporting and storing the spent nuclear fuel (SNF) that is generated by nuclear power plants. Because SNF remains radioactive for thousands of years, long-term storage strategies are essential. However, the search for the safest solution has been long and difficult.

In 1982, Congress passed the Nuclear Waste Policy Act (NWPA), 42 U.S. C. §§ 10101-10270. The NWPA requires the United States Department of Energy to construct a permanent storage facility for the disposal of SNF. The NWPA also establishes a federally monitored temporary storage program in the event that a permanent facility is not available by the deadline.

Under NWPA, the United States Department of Energy and various utility companies controlling nuclear reactors entered into agreements to accept SNF no later than January 31, 1998. However, the Department of Energy has estimated that, at the earliest, it will not have a permanent repository to receive SNF until 2010. See Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed.Reg. 21,793, 21,794 (May 3, 1995). Unless Congress, the Department of Energy, and the Nuclear Regulatory Commission (NRC) take heroic steps, even this date is optimistic. See John Karl Gross, Nuclear Native America: Nuclear Waste and Liability on the Skull Valley Goshute Reservation, 7 B. U. J. Sci & Tech. L. 140, 147-48 n.64 (2001) (reporting estimates that a permanent storage facility may not be available until 2015 or perhaps 2025).

PFS is a consortium of utility companies, which formed in order to seek temporary storage options for the SNF storage problem. In May 1997, PFS entered into a lease of Skull Valley Band tribal land located fifty miles from Salt Lake City. PFS sought to build an SNF storage facility there. The Bureau of

Indian Affairs of the United States Department of Interior has conditionally approved the lease,[1] and PFS has submitted an application for licensure of the facility with the NRC, which remains pending. Under the federal regulations, the proposed facility is characterized as an "independent spent fuel storage installation," see 10 C.F.R. § 72.3, and must satisfy detailed requirements before it may be constructed. See 10 C.F.R. § 72.1 (noting that "the regulations in this part establish requirements, procedures, and criteria for the issuance of licenses to receive, transfer, and possess" SNF).

The Utah officials intervened in the NRC proceedings, arguing that the NRC lacked the authority to license the proposed facility. The NRC rejected that argument, concluding that "Congress, in enacting the Atomic Energy Act, gave the NRC authority to license privately owned, away-from-reactor facilities and did not repeal that authority when it later enacted the Nuclear Waste Policy Act of 1982." In re Private Fuel Storage, L.L.C., 56 N.R.C. 390, 392 (2002). The Utah officials appealed that ruling, and the D.C. Circuit has recently affirmed the NRC's decision. See Bullcreek, 359 F.3d at 541-43.

---

[1] As we have noted in another case involving the lease between PFS and the Skull Valley Band, "[t]he Superintendent [of the BIA] conditioned his approval of the lease (1) upon the successful completion of an environmental impact statement (EIS) evaluating the environmental impacts of the lease in accordance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), and (2) upon the issuance of a license by the Nuclear Regulatory Commission." Utah v. United States Dep't of the Interior, 210 F.3d 1193, 1195 (10th Cir. 2000).

In addition to contesting the licensing proceedings before the NRC, the state of Utah passed a series of statutes between 1998 and 2001 that regulate the storage and transportation of SNF. As the district court explained, the statutes are comprised of four general categories: (1) amendments to Utah's Radiation Control Act, which establish state licensing requirements for the storage of SNF, and which revoke statutory and common law grants of limited liability to stockholders in companies engaged in storing SNF; (2) "the County Planning Provisions," Skull Valley, 215 F. Supp. 2d at 1248-49, which require county governments to impose regulations and restrictions on SNF storage; (3) "the Road Provisions," id., which vest the Governor and the state legislature with authority to regulate road construction surrounding the proposed SNF storage site on the Skull Valley reservation; and (4) "the Miscellaneous Provisions," id. at 1250, which require drug and alcohol testing of employees of companies engaged in SNF storage and which authorize litigation to determine water rights in areas under consideration for SNF storage. As the district court held that "the Miscellaneous Provisions" did not violate the Commerce Clause, and PFS and the Skull Valley Band do not challenge that ruling on appeal,    only the first three categories are at issue here.

<u>A. The Utah Licensing Scheme for SNF Storage Facilities</u>

In Senate Bills 81, 177, and 196, the Utah legislature added Part 3 to Utah's Radiation Control Act. <u>See</u> Utah Code Ann. §§ 19-3-301–317. Part 3 begins with a sweeping prohibition of the transfer, storage, treatment, and disposal of high-level nuclear waste in Utah. It then establishes an alternative licensing scheme for SNF: If the NRC issues a license to an SNF storage facility, if the NRC's authority to issue such a license is upheld by a court of competent jurisdiction, and if a federal government agency transports the waste to a facility in Utah, then the governor, in consultation with county officials and with the concurrence of the state legislature, may approve the storage of SNF in Utah.

Part 3 further provides that SNF storage facilities must be licensed by the state Department of Environmental Quality (DEQ). In order to obtain such a license, the applicant must provide an analysis of groundwater conditions, a security plan, health risk assessments, a quality assurance program, a radiation safety program, and an emergency plan. An applicant must also demonstrate that the facility "will not cause or contribute to an increase in mortality, an increase in illness, or pose a present or potential hazard to human health or the environment." <u>Id.</u> § 19-3-306(3). A license is limited to a term of twenty years and may be extended only by approval of the governor, the legislature and the DEQ.

Additionally, an applicant must enter into a benefits agreement with the

DEQ to "offset adverse environmental public health, social and economical impacts." Id. § 19-3-310(1). Any transportation of SNF must meet with approval from the State Department of Transportation.

Part 3 also imposes substantial application and licensing fees. In order to have its application considered, a party seeking to store SNF in Utah must pay an initial non-refundable application fee of five million dollars. The applicant must also pay an additional fee to cover the costs of reviewing the application and must post a cash bond of at least two billion dollars.

Once an applicant receives a license, it must also pay an amount equal to at least 75% of the "unfunded potential liability" of the project. Id. § 19-3-319(3)(a). That amount is determined by the DEQ, based upon "the health and economic costs expected to result from a reasonably foreseeable accidental release [of SNF]." Id. § 19-3-301(5)(a).

Part 3 also includes a section that revokes statutory and common-law limited liability for officers, directors, and equity-interest owners of companies operating SNF storage facilities in Utah. That section explains that

> [a]n organization engaging in [the transportation and storage of SNF in Utah] has significant potential to affect the health, welfare, or best interests of the state and should not have limited liability for its equity interest holders. To shield equity interest owners from the debts and obligations of an organization . . . would have the effect of attracting capital to enterprises whose goals are contrary to the state's interests.

Id. § 19-3-318(2)(b).

Finally, Part 3 provides for civil and criminal penalties for those who violate or facilitate the violation of its provisions. The Utah Attorney General is authorized to seek an injunction barring any activity that violates the statute. In addition, a court may impose a civil penalty of up to $10,000 per day for each violation. Part 3 also states that the violation of its provisions is a Class A misdemeanor punishable by a maximum fine of $10,000 per day.

## B. The County Planning Provisions

As part of its attempt to regulate SNF storage and transportation, the Utah legislature also passed statutes imposing requirements upon government officials in counties in which SNF storage facilities are proposed. See Utah Code Ann. §§ 17-27-102(2), -301(3), -303(4), -303(5)(b),-303(7), and -308; 17-34-1(3), and -34-6. These statutes give the county officials two options. First, the county may adopt an ordinance stating that all proposals for transporting or storing SNF will be rejected. The state will then indemnify the county from any claims arising out of the county's decision. In the alternative, a county may allow the transportation and storage of SNF within its borders. However, in that event, the county must adopt a comprehensive land use plan that contains detailed information regarding the effects of any proposed SNF site upon the health and general welfare of

citizens of the State. The plan must require "specific measures to mitigate the effects of high-level nuclear waste and greater than class C radioactive waste and guarantee the health and safety of the citizens of the state." Id. § 17-27-301(3)(a)(iii). The county must also conduct a public hearing on any proposal to allow SNF transportation and storage.

The County Planning Provisions also prohibit county governments from providing "municipal-type services" to SNF transportation and storage facilities within the county. Id. § 17-34-1(3)(a). Those services are defined to include fire protection, waste and garbage disposal, planning and zoning, water, sewer, electricity, and law enforcement. Id. § 19-3-303(6) (defining "[m]unicipal-type services").

## C. The Road Provisions

The Road Provisions amend the Utah statutes regulating the construction of railroad crossings. See Utah Code Ann. §§ 54-4-15, 72-3-301, 72-4-125(4), and 78-34-6(5). Although the discretion to grant petitions for railroad crossings is generally vested in the State Department of Transportation, the Utah legislature added a provision in 1999 that states that the resolution of any dispute regarding a petition filed by an entity engaged in SNF storage and transportation "requires the

concurrence of the governor and the legislature in order to take effect." Id. § 54-4-15(4)(b). A second provision designates certain county roads and trails near the Skull Valley Reservation "statewide public safety interest highways," id. § 72-3-301, and provides that the state Department of Transportation has jurisdiction and control over them. A third provision divests the county of control over the only road permitting access to the Skull Valley Reservation and PFS's proposed facility, designating the road a state highway. Finally, a fourth provision states that before the Department of Transportation may exercise eminent domain to grant a right of way to a company engaged in the transportation or storage of SNF, the governor and the legislature must concur.

## D. The District Court Proceedings

PFS and the Skull Valley Band filed this action in 2001 in the United States District Court for the District of Utah, challenging the Utah statutory scheme on various grounds and seeking a declaratory judgment and an injunction barring the application of the statutes to the proposed SNF storage facility on the Skull Valley Band's land. In particular, PFS and the Skull Valley Band alleged that the statutes violate (1) the Supremacy Clause (because they are preempted by federal law); (2) the Commerce Clause; (3) principles of Indian sovereignty and the Indian Commerce Clause; (4) the Contracts Clause; and (5) the First, Sixth, and

Fourteenth Amendments. They named Utah Governor Michael O. Leavitt, Utah Attorney General Mark L. Shurtleff, and officials from the Utah Departments of Environmental Quality and Transportation as defendants.

The defendant officials sought dismissal of the complaint on standing and ripeness grounds. They asserted counterclaims arguing that the NRC had no authority to license private storage facilities for SNF located away from the nuclear reactor that produced it and challenging the approval of the lease by the Skull Valley Band and the Bureau of Indian Affairs.

The district court rejected the defendants' standing challenge. It concluded that "[t]his suit involves the Plaintiffs' constitutional right to seek a government benefit, a license from the NRC, free from allegedly preempted state laws." Skull Valley Band, 215 F. Supp. 2d at 1241. Accordingly, "[the Plaintiffs'] right to seek a license [was] not in doubt" and they thus had standing to challenge the Utah statutes. Id.

The district court also rejected the defendants' argument that the case was not ripe. "Whether the NRC ultimately grants or denies Plaintiffs a license," the court stated, "is not material to this lawsuit." Id. As a result, there were no uncertain or contingent events that rendered the case unfit for judicial resolution. Id..

As to the defendants' counterclaims, the district court ruled that: (1) to the extent that they had challenged the authority of the NRC to license the proposed facility, those claims must be resolved on appeal of the NRC proceedings under the Hobbs Act, 28 U.S.C. §§ 2342-51; (2) the defendants lacked standing to challenge the Skull Valley Band's alleged failure to properly approve the lease; and (3) because the challenge to the conditional approval of the lease by the BIA had already been rejected by this circuit as not ripe, see Utah v. United States Dep't of Interior, 210 F.3d at 1197, the defendants were estopped from raising that issue again in this case.

On the merits of the plaintiffs' Supremacy Clause claim, the court applied the preemption standard set forth in Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190 (1983). There, the court held that "Congress . . . intended that the federal government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant" and that "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." Id. at 205, 212. The district court held that Part 3 of the Radiation Safety Act, the County Planning Provisions, and the Road Provisions concerned radiological safety and were therefore preempted by federal law. Because the district court struck down these statutes on Supremacy Clause

grounds, it did not address the other constitutional challenges advanced by PFS and the Skull Valley Band.   See Skull Valley , 215 F. Supp. 2d at 1250 n.12.

However, the district court did uphold the "the Miscellaneous Provisions" (concerning employee drug testing and the determination of water rights), which PFS and the Skull Valley Band had challenged only on Commerce Clause grounds.  The court reasoned that the provisions had only indirect and incidental effects on interstate commerce and were supported by important local concerns. Id. at 1251.

## II. Justiciablity

On appeal, the defendant Utah officials first contend that PFS and the Skull Valley Band lack standing to challenge the Utah statutes regulating SNF transportation and storage.  The officials then argue that the case is not ripe for review.

These challenges are based primarily on the Utah officials' contention that federal law does not allow away-from-the-reactor storage of SNF in privately owned facilities.  The Utah officials advanced that argument unsuccessfully in the NRC's licensing proceedings.  Earlier this year, in an appeal from the NRC's ruling on that issue, the D.C. Circuit rejected that argument as well.  See Bullcreek, 359 F.3d at 538-43.

Because the D.C. Circuit's ruling forecloses the majority of the Utah officials' standing and ripeness challenges, we begin with an overview of that decision. Then we proceed to the remaining standing and ripeness arguments.

A. The D.C. Circuit's Ruling

In the NRC proceedings, the D.C. Circuit appeal, and in this case, the Utah officials have invoked a provision of the NWPA that provides:

> Notwithstanding any other provision of law, nothing in this chapter shall be construed to encourage, authorize, or require the private or Federal use, purchase, lease, or other acquisition of any storage facility located away from the site of any civilian nuclear power reactor and not owned by the Federal Government on January 7, 1983.

42 U.S.C. § 10155(h).

According to the Utah officials, this language establishes that PFS had no right to obtain a license from the NRC for the proposed SNF storage facility. Thus, they reason, it is not the Utah statutes here at issue that have deprived PFS and the Skull Valley Band of a legally cognizable interest but rather a federal statute. Accordingly, they conclude, PFS and the Skull Valley Band lack standing to assert their claims.

In rejecting the challenge to the NRC's licensing authority, the D.C. Circuit concluded that a previously enacted statute, the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011–2297g-4, authorizes the NRC to license privately-

-16-

owned, away-from-reactor storage facilities such as the one proposed by PFS.

See Bullcreek, 359 F.3d at 538-43. The court reasoned that the text of §
10155(h), read in light of the other provisions of the NWPA, "demonstrates that
Congress did not intend to repeal or supersede the NRC's authority under the
AEA to license and regulate private use of private away-from-reactor spent fuel
storage facilities." Id. at 541. The D.C. Circuit found additional support for
this conclusion in the legislative history. See id. at 543 ("Nothing in those
[congressional] reports and debates suggests that Congress intended to prohibit
private use of private away-from-reactor facilities.").

We are persuaded by the D.C. Circuit's opinion and will thus not revisit
the issues surrounding the NRC's authority to license away-from-reactor SNF
storage facilities such as the one at issue here. However, to the extent that the
Utah officials raise standing and ripeness challenges based on other arguments,
we will now address them.

## B. Standing

In addition to contending that the NRC lacks authority to license away-
from-reactor storage facilities, the Utah officials challenge PFS's and the Skull
Valley Band's standing on other grounds. They argue that PFS and the Skull
Valley Band have alleged a mere "procedural injury" and that they have failed to

present any evidence they suffered the kind of concrete injury necessary to establish standing. Moreover, the defendant officials contend, the district court erred in concluding that PFS and the Skull Valley Band had standing without first addressing the fundamental question of whether federal law authorized the NRC to license the kind of facility at issue here. We consider these questions of standing de novo. See Lee v. United States Air Force, 354 F.3d 1229, 1245 (10th Cir. 2004).

The Utah officials' arguments are based on clause 2 of Article III of the United States Constitution, which provides that federal courts may only adjudicate actual cases or controversies. The Supreme Court has observed that perhaps the most important aspect of this case or controversy requirement is that the party invoking the jurisdiction of the federal court must have standing to do so. Allen v. Wright, 468 U.S. 737, 750 (1984). In order to establish standing, a party must demonstrate: (1) "injury in fact," which means "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;]" (2) "a causal relationship between the injury and the challenged conduct[;]" and (3) "a likelihood that the injury will be redressed by a favorable decision." Northeastern Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 663-64 (1993) (internal quotation marks omitted).

-18-

The district court found that PFS and the Skull Valley Band had established these elements. The court reasoned that the plaintiffs were not asserting the right to own and operate an SNF storage facility. Instead, "[w]hat Plaintiffs claim here is that the Utah laws harm them by (1) hindering their licensing efforts before the NRC and by (2) creating uncertainty as to the utility of proceeding with their licensing efforts before the NRC." Skull Valley, 215 F. Supp. 2d at 1240. In other words, the court wrote, "[p]laintiffs seek to secure their right to proceed before the NRC in their licensing attempt free from state interference." Id.

Moreover, the court concluded, it could properly adjudicate the case without reaching the merits of the Utah officials' challenge to the NRC's legal authority to license away-from-reactor storage facilities or awaiting the results of PFS's pending licensing proceeding before the NRC. The court invoked decisions holding that "'[w]hether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits.'" Id. (quoting Claybrook v. Slater, 111 F.3d 904, 907 (D.C. Cir. 1997)).

1.  "Procedural Injury"

    In arguing that PFS and the Skull Valley Band have alleged injury to only a "procedural right" that is insufficient to establish standing, the Utah officials rely on the Supreme Court's decision in Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 (1992). They also invoke this circuit's decision in In re Integra Realty Resources, Inc., 262 F.3d 1089 (10th Cir. 2001). In our view, neither decision supports the Utah officials' argument.

    Lujan concerns the claim of several environmental groups that an Interior Department regulation violated a statute requiring agencies to consult with "affected States" before taking an action that might threaten an endangered species. 504 U.S. at 558 (quoting 16 U.S.C. § 1536(a)(2)). The challenged regulation concluded that the duty to consult did not apply to actions taken in foreign nations. As one basis for concluding that the environmental group had standing, the Eighth Circuit had held that the environmental groups had suffered a "procedural injury." Id. at 571-572. In the Eighth Circuit's view, "*anyone* [could] file suit in federal court to challenge the Secretary's (or presumably any other official's) failure to follow the assertedly correct consultative procedure, notwithstanding his or her inability to allege any discrete injury flowing from that failure." Id. In other words, the Eighth Circuit's concluded that "the injury-in-fact requirement had been satisfied by congressional conferral upon *all*

persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." Id. at 573.

The Supreme Court rejected that view. The Court explained that it had "consistently held that a plaintiff raising only a generally available grievance about government . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." Id. at 573-74.

Our decision in Integra Realty, 262 F.3d at 1101-1103, follows similar reasoning. There we held that certain plaintiffs who had opted out of a settlement lacked standing to challenge the terms of that settlement because they had not alleged that they suffered legal prejudice. At most, the plaintiffs had alleged that the settlement had "placed them at a tactical disadvantage." Id. at 1103.

Here, PFS's and the Skull Valley Band's alleged injury is much more than a generally available grievance about the government or a tactical disadvantage. Instead, they have alleged that the Utah statutes have affected them concretely. In particular, PFS has alleged that the statutes impose substantial burdens upon it because of the SNF storage project that it has proposed (requiring, for example, the payment of a five million dollar nonrefundable application fee, compliance with complex state regulatory requirements, and the posting of a two billion

dollar bond). The Skull Valley Band has alleged that the Utah statutes infringe upon its "inherent tribal sovereignty." Aplts' App. at 39. Moreover, according to PFS and the Skull Valley Band, the extensive obligations created by the Utah statutes are preempted by federal law.

We agree with PFS and the Skull Valley Band that a party seeking a license from a governmental agency generally has standing to challenge an allegedly invalid law that either imposes substantial burdens upon the applicant or flatly prohibits the activity in question. Several courts have suggested that conclusion in addressing ripeness challenges, and, although "standing and ripeness are technically different doctrines, they are closely related in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention." Johnson v. Missouri, 142 F.3d 1087, 1090 n.4 (8th Cir. 1998) (quoting Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975)); see also Morgan v. McCotter, 365 F.3d 882, 887 (10th Cir. 2004) (finding issues of standing and ripeness "particularly difficult to divorce").

For example, in Gary D. Peake Excavating Inc., v. Town Board of the Town of Hancock, 93 F.3d 68, 71-73 (2d Cir. 1996), the court found ripe for review a Commerce Clause challenge to a municipal ordinance brought by a company that had applied for a construction permit from a state agency. Observing that the challenged municipal ordinance banned the proposed

construction, the court concluded that "[i]f we uphold the [municipal] ordinance [the applicant] will be able to cut his losses by halting his efforts to obtain [a state agency] permit; if we invalidate the ordinance, [the applicant] can continue with the [state agency's] permitting process, knowing that obtaining [a state agency] permit will not have been in vain." Id. at 73.

In Triple G. Landfills, Inc. v. Board of Commissioners of Fountain County, 977 F.2d 287, 288-91 (7th Cir. 1992), the court reached a similar conclusion. There, a company challenged a county's landfill permit ordinance even though the company had not yet obtained the required state permit. In finding the claim ripe for review, the court reasoned that the permit applicant had "a direct, tangible, and not merely hypothetical interest in the subject matter of this litigation" because "the siting standards imposed under the [county] ordinance are far more stringent that those imposed by the State and here effectively preclude [the applicant] from developing its tract" and because "[p]ostponing judicial action . . . would force an unwarranted dilemma upon [the applicant]: either scuttle its development plans altogether in deference to a potentially invalid county regulation, or complete the expensive and time-consuming state permit process, submit an permit application that [the county] is almost certain to reject, and then, after incurring substantial sunk costs, bring a facial challenge to the ordinance." Id. at 291, 289, and 290.

Here, the Utah statutes place PFS in circumstances similar to the plaintiffs in Peake Excavating and Triple G. Landfills, imposing a second burdensome and costly licensing scheme. The validity of that scheme is an important and perhaps even a dispositive factor in determining whether the proposed SNF facility is viable. As the district court recognized, PFS and the Skull Valley Band thus have standing to challenge that scheme. See ANR Pipeline v. Corp. Comm'n of Okla., 860 F.2d 1571, 1578-79 (10th Cir. 1988) (holding that the plaintiff had standing to challenge state agency's regulations as preempted under federal law because compliance with the regulations would "increase the price of natural gas, impair contractual obligations, and disrupt utilization of pipeline facilities" and that plaintiffs "need not . . . await the imposition of penalties under an unconstitutional enactment in order to assert their constitutional claim for an injunction in federal court").

2. Evidence of Injuries

The Utah officials' argument that PFS and the Skull Valley Band have failed to present sufficient evidence that they have suffered concrete injuries as a result of the Utah statutes is also unpersuasive. As the Supreme Court observed in Lujan, "[w]hen the suit is one challenging the legality of government action or

-24-

inaction, the nature and extent of facts that must be averred . . . or proved . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." Lujan, 504 U.S. at 561. However, if the plaintiff is the subject of challenged action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring action will address it." Id. at 561-62.

Here, PFS and the Skull Valley Band are indeed "the subject of the challenged action"—the allegedly preempted Utah statutes. The obligations and burdens imposed by those statutes speak for themselves, and no additional evidence is necessary to establish standing. Cf. Heckler v. Mathews, 465 U.S. 728, 740 n.9 (1984) (concluding that the plaintiff had standing to challenge a federal statute on constitutional grounds because there was "no doubt about the direct causal relationship between the government's alleged deprivation of appellee's right to equal protection and the personal injury appellee has suffered—denial of . . . benefits solely on the basis of [the classification]").

3. The Timing of the District Court's Ruling

Finally, we conclude that the district court acted properly in resolving the standing question without first addressing the Utah officials' challenge to the NRC's authority to license away-from-reactor storage facilities. Under the

Administrative Orders Review (or Hobbs) Act, 28 U.S.C. §§ 2341-51, the court of appeals has "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or to determine the validity of" final orders of the NRC. 28 U.S.C. § 2342; see Fla. Power & Light Co., v. Lorion, 470 U.S. 729, 737 (1985) (concluding that "Congress intended to provide for initial court of appeals review of all final orders in licensing proceedings" before the NRC); Envtl. Def. Fund v. United States Nuclear Regulatory Comm'n, 902 F.2d 785, 786 (10th Cir. 1990) (stating that "[j]urisdiction to review final orders of the NRC lies exclusively in the United States Courts of Appeal") (citing 42 U.S.C. § 2239(b) and 28 U.S.C. § 2342(4)). Here, at the time of the district court's ruling, the Utah officials had challenged the authority of the NRC to license the proposed facility in proceedings before the NRC itself. Under the Administrative Orders Act, resolution of that issue was the responsibility not of the district court but rather of the NRC and the appropriate court of appeals. See Skull Valley, 215 F. Supp. 2d at 1252 (noting that Utah officials "may and have challenged the lawfulness of the proposed facility in the NRC licensing process" and that "all parties have the right to appeal the NRC's decision to the appropriate court of appeals"); Bullcreek, 359 F.3d at 537-43 (D.C. Circuit decision affirming the NRC's ruling that it has authority to license away-from-reactor SNF storage facilities).

However, even though the district court lacked jurisdiction to adjudicate the Utah officials' challenge to the NRC's authority, that limitation does not undermine its conclusion that PFS and the Skull Valley Band had standing to challenge the Utah statutes before the issue of NRC's authority was finally resolved. To be sure, if the Utah officials had ultimately prevailed on their contention that federal law does not permit the NRC to license away-from-reactor storage facilities owned by private parties, one might well conclude that PFS and the Skull Valley Band lacked "a legally protected interest" that could be vindicated in a lawsuit. See City of Jacksonville, 508 U.S. at 663-64 (discussing standing principles). Moreover, as the district court observed, there are instances in which courts have examined the merits of the underlying claim and concluded that the plaintiffs lacked a legally protected interest and therefore lacked standing. See Skull Valley, 215 F. Supp. 2d at 1240-41 (discussing cases); see, e.g., Claybrook v. Slater, 111 F.3d 904, 907 (D.C. Cir. 1997) ("[I]f the plaintiff's claim has no foundation in law, he has no legally protected interest and thus no standing to sue."); Arjay Assoc. Inc. v. Bush, 891 F.2d 894, 898 (Fed. Cir. 1989) (concluding that the plaintiffs had "no right to conduct foreign commerce in products excluded by Congress" and therefore lacked standing because they had "no right capable of judicial enforcement and have thus suffered no injury

capable of judicial redress"). However, those cases are distinguishable from this dispute.

Here, at the time the district court issued its summary judgment ruling, PFS's and the Skull Valley Band's claims did have "a foundation in law." Claybrook, 111 F.3d at 907. PFS sought a license from a federal agency that had established regulations and procedures for reviewing such applications. See 10 C.F.R. part 72; Bullcreek, 359 F.3d at 538 (discussing NRC's regulations and stating that "it has long been recognized that the [Atomic Energy Act] confers on the NRC authority to license and regulate the storage of [spent nuclear fuel]"). PFS asserted a right under the Supremacy Clause to seek a federal license pursuant to these established procedures without interference from allegedly preempted state statutes. As to the Skull Valley Band, federal law has long recognized the tribes' interests as sovereigns in control over tribal lands. See, e.g, Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137 (1982) (recognizing "the tribe's general authority, as sovereign, to control economic activity within its jurisdiction"); Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1508 (10th Cir. 1997) (acknowledging a tribe's interests as a sovereign "in protecting and vindicating the rights of its residents, as well as its interest as lessor of the land"). The Skull Valley Band asserted that the Utah statutes unduly infringed

that interest.  Thus, both plaintiffs have asserted protected legal interests necessary to establish standing.

## C.  Ripeness

The Utah officials also argue that this case is not ripe for judicial review. As the district court observed, the doctrine of ripeness is intended to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.  In determining whether a claim is ripe, a court must look at  "[1] the <u>fitness</u> of the issue for judicial resolution and [2] the <u>hardship</u> to the parties of withholding judicial consideration."  <u>United States v. Wilson</u>, 244 F.3d 1208, 1213 (10th Cir. 2001) (emphasis added).

Under the first prong of the ripeness inquiry—fitness for judicial resolution—the court must determine whether the matter involves uncertain events which may not happen at all, and whether the issues involved are based on legal questions or factual ones.  If there are factual issues that need further development, the matter may not be fit for resolution.  <u>See</u> <u>id.</u> at 1214.  Fitness for judicial resolution may depend upon whether it is "purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final."  <u>Clean Air Implementation</u>

Project v. EPA, 150 F.3d 1200, 1204 (D.C. Cir. 1998) (internal quotation marks omitted).

Under the second prong of the ripeness inquiry—the potential hardship of withholding judicial resolution—we examine "whether the challenged action creates a direct and immediate dilemma for the parties." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1498-99 (10th Cir. 1995) (internal quotation marks omitted).

Here, the Utah officials' have based their ripeness challenge in part upon the uncertainty concerning the NRC's authority to issue away-from-reactor licenses. The D.C. Circuit's decision in Bullcreek resolves that question and thus forecloses that particular argument. However, the Utah officials have also argued that the case is not ripe because (1) the NRC has not yet granted a license to PFS for the SNF storage facility and issues surrounding the Department of the Interior's review of the lease have not yet been finally resolved and (2) PFS failed to offer evidence that it would suffer any injury if the district court deferred its ruling until the NRC's final decision on the license application.

In rejecting those arguments, the district court addressed both prongs of the ripeness inquiry. The court first concluded that there were no uncertain or contingent events that would render this case unfit for resolution. It characterized the remedy sought by PFS as "the right to proceed before the NRC

without interference from the Utah laws." Skull Valley, 215 F. Supp. 2d at 1241. Whether the NRC ultimately granted or denied PFS's application, the court stated, was not relevant to the resolution of PFS's asserted right to seek the license free from state interference. Instead, the issues to be resolved were primarily legal ones that were appropriately resolved upon the parties' summary judgment papers.

As to the second prong of the ripeness inquiry, the hardship upon the parties, the court observed that, in the proceedings before the NRC, Utah officials had invoked the statutory provision prohibiting county governments from providing services to SNF storage facilities. That provision, the court concluded, subjected PFS to immediate harm in the NRC licensing proceeding. Next, the district court found that the Utah laws created uncertainty about the future costs of constructing and maintaining the storage facility. The court cited various provisions of the challenged statutes, including the five million dollar application fee, the 75% transaction fee, and the 75% unfunded liability fee and concluded that, if the state statutory scheme was upheld, "more likely than not PFS would not proceed with the construction of the proposed facility." Skull Valley, 215 F. Supp. 2d at 1242.

We review the district court's resolution of the ripeness issue de novo. See Gordon v. Norton, 322 F.3d 1213, 1219 (10th Cir. 2003). For substantially

the same reasons given by the district court, we agree that the case is ripe for review.

As to the first prong of the ripeness inquiry—fitness for judicial resolution—we again note that the D.C. Circuit's decision in Bullcreek has removed many of the uncertainties invoked by the Utah officials. We now have the benefit of a persuasive ruling that the NRC is authorized by federal law to license away-from-reactor storage facilities.[2]

Similarly, the other contingencies noted by the Utah officials—such as the possibility that the NRC may deny PFS's license application or that the Department of the Interior may rescind its conditional approval of the Skull Valley Band's lease—do not render the case unfit for judicial review. Although such decisions would clearly affect the issue of ultimate concern to the parties—whether the SNF storage facility is constructed—the question of whether the federal licensing proceeding can now proceed without a separate Utah state licensing scheme imposing additional legal requirements upon PFS

---

[2] Even though the D.C. Circuit's opinion was not issued until after the district court granted summary judgement to PFS and the Skull Valley Band, we may properly consider it in assessing ripeness. See Am. Motorists Ins. Co. v. United Furnace Co., 876 F.2d 293, 302 n.4 (2d Cir. 1989) ("Intervening events relevant to the ripeness inquiry should be considered and may be determinative."); 13A C. Wright, A. Miller, & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3532.1, at 136 (2d ed. 1984) ("Ripeness should be available on the basis of all the information available to the court. Intervening events that occur after decision in lower courts should be included.").

and the Skull Valley Band is a legal issue that currently affects the parties and may now be decided. See Pacific Gas, 461 U. S. at 201 (concluding that a challenge to a state law regarding nuclear plant construction was ripe for review and observing that "[t]he question of preemption is predominantly legal").

As to the second prong of the ripeness inquiry—the hardship that would be suffered by the parties if we do not decide the case now—we agree with the district court that in light of the substantial costs of licensing a PFS storage facility under the Utah statutory scheme, PFS and the Skull Valley Band have alleged "a direct and immediate harm." Skull Valley, 215 F. Supp. 2d at 1243. The Supreme Court's decision in Pacific Gas directly supports this conclusion.

There, in rejecting a ripeness challenge to a state statute imposing a moratorium on nuclear plant construction, the Court noted the hardship that would be imposed if a judicial decision were delayed: The utilities who had challenged the state law would be required to expend millions of dollars over a number of years without knowing whether that expenditure was entirely futile. 461 U.S. at 201. The same is true here. To delay a decision would impose upon PFS and the Skull Valley Band the uncertainty of not knowing whether they will be required to incur the substantial expenses and comply with the numerous regulatory requirements imposed by the Utah statutes. Cf. Gary D. Peake Excavating Inc., 93 F.3d at 71-73 (2d Cir. 1996) (finding ripe a Commerce

Clause challenge to a municipal ordinance imposing permit requirements that were stricter than those of a state agency); Triple G. Landfills, 977 F.2d at 288-91 (finding ripe a challenge to a permit scheme because of the uncertainties it created).

The Supreme Court has recognized that "[t]he construction of new nuclear facilities requires considerable advance planning." Pacific Gas, 461 U.S. at 201. Thus, the hardship that would result from delaying a ruling on the merits convinces us that the case is ripe for review.

III.  Supremacy Clause Claim

We now proceed to the merits of this dispute.  The Utah officials argue that the district court erred in concluding that federal law preempts the challenged statutes.  According to the Utah officials, the following statutory provisions are not preempted: (1) the sections of the County Planning Provisions that prohibit counties from offering certain services to SNF storage facilities; (2) the Unfunded Potential Liability Provisions, which require those seeking to create an SNF storage site to "pay to [the state Department of Environmental Quality] not less than 75% of the unfunded potential liability" arising out of the operation of the facility, Utah Code Ann. § 19-3-319(3); (3) the provisions rescinding limited liability for officers and equity interest owners of companies

operating SNF storage facilities; (4) the Road Provisions, which vest the governor and the state legislature with control over the area surrounding the proposed SNF site; and (5) specific provisions of the state licensing scheme set forth in Part 3 of Utah's Radiation Control Act.

We begin by examining general principles of federal preemption. Then we turn to the Utah officials' specific challenges to the district court's ruling.


### A. Federal Preemption

The district court's ruling is grounded in the Supremacy Clause of the United States Constitution, which states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause "embodies the fundamental principle that in certain areas the United States must act as a single nation, led by the federal government, rather than as a loose confederation of independent sovereign states." Abraham v. Hodges, 255 F. Supp. 2d 539, 549 (D.S.C. 2002). In light of the Supremacy Clause, Congress may, within the limits set forth elsewhere in the Constitution, enact legislation that preempts

state law.  See Pacific Gas, 461 U.S. at 203-04; Mount Olivet Cemetery Ass'n v. Salt Lake City, 164 F.3d 480, 486 (10th Cir. 1998).

The preemptive effect of federal law may be apparent from the text of the statute.  See Pacific Gas, 461 U.S. at 203 ("It is well-established that within Constitutional limits Congress may preempt state authority by so stating in express terms.").  Federal preemption may also be implicit:

> Congress' intent to supercede state law altogether may be found from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and character of obligations imposed by it may reveal the same purpose.

Id. at 203-04 (internal quotation marks omitted).

Even absent such "field preemption," however, federal law may still preempt state law to the extent that state law actually conflicts with federal law.  Pacific Gas, 461 U.S. at 204.  Such conflicts occur when "compliance with both federal and state regulations is a physical impossibility," id.  (internal quotation marks omitted), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Id. (internal quotation marks omitted).

-36-

In each instance, the question of preemption is one of determining Congressional intent. Wardair Canada, Inc. v. Fla. Dep't of Revenue, 477 U.S. 1, 6 (1986). Therefore, in order to determine whether the Utah statutes at issue are preempted, we must examine the federal statutes regulating nuclear power.

### B. Federal Regulation of Nuclear Power

Federal regulation of privately-owned nuclear power facilities began with the Atomic Energy Act of 1954. Until that time, the ownership of nuclear technology remained a federal monopoly. English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990). The 1954 Act "stemmed from Congress' belief that the national interest would be served if the Government encouraged the private sector to develop atomic energy for peaceful purposes under a program of federal regulation and licensing." Id. "The Act implemented this policy decision by opening the door to private construction, ownership, and operation of commercial nuclear-power reactors under the strict supervision of the Atomic Energy Commission." Id. Congress thus allowed the licensing of private construction, ownership, and operation of commercial nuclear power reactors. However, the 1954 Act gave the Atomic Energy Commission "exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession, and use of nuclear materials." Pacific Gas, 461 U.S. at 207 (citing 42 U.S.C. §§

2014, (e), (z), (aa), 2061-2064, 2071-2078, 2091-99, 2111-14); see also Farley, 115 F.3d at 1503 (stating that, under the 1954 Act, "[h]azards arising from atomic radiation were made a particularly federal concern, as to which the states had no authority to regulate").

In 1957, Congress amended the Atomic Energy Act through the Price-Anderson Act, 42 U.S.C. § 2210. The Price-Anderson Act creates specific protections from tort liability for the operators of nuclear facilities: "(1) an aggregate ceiling on the liability for nuclear tort claims; (2) a channeling of liability provision to protect private entities from liability for their indirect participation in atomic development; and (3) an indemnification program," under which the federal government requires nuclear facilities to obtain private insurance coverage up to a certain level and indemnifies the facilities above that amount, up to a specified liability ceiling. Farley, 115 F.3d at 1503.[3]

---

[3] Congress substantially amended the Price-Anderson Act in 1966 and 1988. The 1966 amendments " [1] require participants in the nuclear industry to waive certain key defenses to liability that might otherwise be permissible under applicable State or Federal law[;] . . . [2] apply[] the . . . defense waiver provision only to public liability actions arising from an extraordinary nuclear occurrence, [and] . . . [3] confer[] upon the United States district court in the district in which an extraordinary nuclear occurrence takes place original jurisdiction with respect to any public liability action arising out of such an [occurrence]." Cook v. Rockwell Int'l Corp., 273 F. Supp. 2d 1175, 1184-85 (D. Colo. 2003) (internal quotation marks and citations omitted). "The focus of the 1988 Price-Anderson Amendments Act was on extending and increasing the pool of funds available to compensate victims of a nuclear incident and on extending, clarifying, and in some cases expanding the reach of various aspects of the Price-Anderson system."

(continued...)

Two years later, Congress again amended the Atomic Energy Act. The purpose of the 1959 amendments was to "'clarify the respective responsibilities . . . of the States and the [Federal Government] with respect to the regulation of byproduct, source, and special nuclear materials, and generally to increase the States' role'" by authorizing the Atomic Energy Commission to enter into agreements with state governors authorizing "'coordinated and compatible'" state regulation of certain nuclear materials. English, 496 U.S. at 81 (quoting 42 U.S.C. § 2021(a)(1) and (g)) (alternations in original). However, the 1959 amendments limited the scope of these federal-state agreements. Congress specifically directed the Atomic Energy Commission to

> retain authority and responsibility with respect to regulation of . . . the construction and operation of any production or utilization facility . . . and . . . the disposal of such . . . byproduct, source or special nuclear material as the Commission determines . . . should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the Commission.

Pacific Gas, 461 U.S. at 209 (quoting 42 U.S.C. § 2021(c)); see also Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 250 (1984) (explaining that "Congress' decision to prohibit the states from regulating the safety aspects of nuclear development was premised on its belief that the Commission was more qualified to determine what type of safety standards should be enacted in this complex

[3](...continued)
Id. at 1187.

-39-

area. As Congress was informed by the AEC, the 1959 legislation provided for continued federal control over the more hazardous materials because 'the technical safety considerations are of such complexity that it is not likely that any State would be prepared to deal with them during the foreseeable future.'") (quoting H.R. Rep. No. 1125, 86th Cong., 1st Sess. 3 (1959)).

In 1974, Congress passed the Energy Reorganization Act, 42 U.S.C. §§ 5801 et seq., which abolished the Atomic Energy Commission and transferred its licensing and regulatory functions to the NRC. The 1974 Act also "expanded the number and range of safety responsibilities under the NRC's charge." English, 496 U.S. at 81.

In 1982, Congress enacted the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270. That act was passed "in response to 'a national problem' created by the accumulation of spent nuclear fuel from private nuclear generators, as well as radioactive waste from reprocessing such fuel, activities related to medical research, diagnosis, and treatment, and other sources." Bullcreek, 359 F.3d at 538 (quoting 42 U.S.C. § 10131(a)(2)). Noting that previous efforts of the federal government to find a permanent solution to the problem of storing SNF have been inadequate, the NWPA establishes a schedule for developing a permanent federal repository. Id. (discussing 42 U.S.C. §§ 10131-10145). As an alternative to a permanent facility, the statute also establishes a federally-

monitored temporary storage program.  Id. (discussing 42 U.S.C. §§ 10161-10169).  Congress also found that those who generate SNF have "'the primary responsibility to provide for, and . . . to pay the costs of, the interim storage of such . . . spent fuel,'" and it thus "limited the federal government's obligation to assist private nuclear generators with interim storage." Id. (quoting 42 U.S.C. § 10131(a)(5) and discussing § 10151(a)(1)).  Accordingly, the NWPA requires private operators of nuclear facilities to exhaust onsite options for storage.  Id. (discussing 42 U.S.C. §§ 10155(b)(1), 10151(a)(1), and 10152).

Pursuant to these statutes, the Atomic Energy Commission and the NRC have promulgated detailed regulations regarding the operation of nuclear facilities, including the storage of SNF.  See 10 C.F.R. Part 72; Bullcreek, 359 F.3d at 538 (stating that the 1954 Act "authorized the NRC to regulate the possession, use, and transfer of the constituent materials of spent nuclear fuel, including special nuclear material, source material, and byproduct material" and that  "[w]hile the [Atomic Energy Act] does not specifically refer to the storage or disposal of spent nuclear fuel, it has long been recognized that the [Atomic Energy Act] confers on the NRC authority to license and regulate the storage and disposal of such fuel").  These regulations establish requirements for the licensing of spent nuclear fuel storage facilities both at and away from the reactor site.  The regulations also establish recordkeeping and inspection

-41-

requirements, site evaluation criteria, design requirements, quality assurance, and training and certification of personnel.

C. Supreme Court Decisions

Three Supreme Court decisions have addressed the preemptive effect of this extensive federal regulatory scheme in considerable detail: Pacific Gas, 461 U.S. at 203-23; Silkwood, 464 U.S. at 248-57; and English, 496 U.S. at 80-90. Interestingly, in all three cases, the Court concluded that the state laws at issue were not preempted. Obviously, the parties disagree as to how these decisions should be applied to the Utah statutes.

In Pacific Gas, a utility company sought an injunction barring the enforcement of a state statute imposing a moratorium on the construction of new nuclear power plants in California pending development of a plan for disposal of nuclear waste. Examining the text of the Atomic Energy Act, the Court identified "a field in which the federal interest is . . . dominant"—"the radiological safety aspects involved in the construction and operation of a nuclear plant." 461 U.S. at 204-05 (internal quotation marks omitted).

Accordingly state laws within "the entire field of nuclear safety concerns" are preempted, even if they do not directly conflict with federal law. Id. at 212. Thus, "[a] state moratorium grounded in safety concerns falls squarely within the

prohibited field," as would "a state judgment that nuclear power is not safe enough to be further developed." Id. at 213. However, if state regulation is grounded in "a non-safety rationale," it may fall outside the preempted field. Id.

The Court concluded that a non-safety rationale supported California's moratorium: the economic costs of allowing construction of additional nuclear power plants before adequate SNF storage facilities could be developed. Id. at 216 (accepting the state's "avowed economic purpose" in enacting the statutory moratorium). Thus, the statute lay outside the preempted field.

The Court also concluded that the moratorium did not conflict with the objectives of federal law. Although the primary purpose of the Atomic Energy Act is the promotion of nuclear power, that power is not to be developed "at all costs." Id. at 222. Congress had left to the states to determine whether, as a matter of economics, a nuclear power plant should be constructed.

In Silkwood, 464 U.S. at 248-57, the Court applied these preemption principles to a state law punitive damages award arising out of exposure to radioactive materials at a nuclear power plant. Focusing on the legislative history of the Price-Anderson Act and the amendments to it, the Court held that the punitive damages award was not preempted and found "ample evidence" that Congress did not intend to bar such a remedy. Id. at 251.

The Court acknowledged a tension between the federal government's exclusive power to regulate "the radiological safety aspects involved in the construction and operation of a nuclear plant," Pacific Gas, 461 U.S. at 205, and "the conclusion that a state may nevertheless award damages based upon its own law of liability." Silkwood, 464 U.S. at 256. Nevertheless, Congress intended to stand by both concepts. See id. ("It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.").

The Court added that in certain instances, the recovery of damages for radiation injuries might still be preempted. However:

> insofar as damages for radiation injuries are concerned, preemption should not be judged on the basis that the federal government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law.

Id.

In English, 496 U.S. at 90, the Supreme Court considered another state law cause of action, concluding that, like the state law in Silkwood, it too was not preempted. An employee of nuclear fuel production facility had filed a claim for

-44-

intentional infliction of emotional distress arising out of her employer's allegedly retaliating against her for having reported suspected violations of nuclear safety violations to the NRC. The Court held that the state law claim "d[id] not fall within the pre-empted field of nuclear safety," id., and did not conflict with a provision of the 1978 amendments to the Atomic Energy Act that encourages employees to report safety violations and establishes a procedure to protect them from any resulting retaliation. Id. at 82 (discussing 42 U.S.C. § 5851).

The Court rejected the broad reading of Pacific Gas offered by the defendant employer, which suggested that the federal statute protecting nuclear industry employees from retaliation preempted all state tort laws that traditionally have been available to employees alleging outrageous conduct by their employers. Under the preemption inquiry established by Pacific Gas, the Court reasoned, "part of the pre-empted field is defined by reference to the purpose of the state law in question," and "another part of the field is defined by the state law's actual effect on nuclear safety." Id. at 84.

The Court then noted that the state tort law at issue was not motivated by safety concerns. Thus, the preemption inquiry should focus upon the effect of the state law, asking whether the law had "some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." Id. at 85. Because such a direct and substantial

-45-

effect was lacking, the Court concluded that the state law claim did not fall within the preempted field of nuclear safety.

Nevertheless, the <u>English</u> court did acknowledge that a state law claim for intentional infliction of emotional distress might have some effect on radiological safety decisions:

> We recognize that the claim for intentional infliction of emotional distress at issue here may have some effect on these decisions, because liability for claims like petitioner's will attach additional consequences to retaliatory conduct by employers. As employers find retaliation more costly, they will be forced to deal with complaints by whistle-blowers by other means, including altering radiological safety policies. Nevertheless, we believe that this effect is neither direct nor substantial enough to place petitioner's claim in the pre-empted field.

<u>English</u>, 496 U.S. at 85.

Several other courts have applied the preemption analysis set forth in <u>Pacific Gas</u>, <u>Silkwood</u>, and <u>English</u> to state laws barring the transportation and storage of SNF. Some of these decisions have concluded that the challenged laws are within the preempted field of nuclear safety.[4] Other decisions have

---

[4] <u>See</u> <u>United States v. Kentucky</u>, 252 F.3d 816, 820-21, 823 (6th Cir. 2001) (holding that the Atomic Energy Act preempted conditions regarding the disposal of radioactive wastes that had been imposed by a state agency in a landfill permit); <u>Jersey Cent. Power & Light Co. v. Township of Lacey</u>, 772 F.2d 1103, 1110-12 (3d Cir. 1985) (holding that the Atomic Energy Act preempted a township ordinance prohibiting importation of SNF or other radioactive waste for the purpose of storage); <u>Wash. State Bldg. & Constr. Trades Council v. Spellman</u>, 684 F.2d 627, 629, 630 (9th Cir. 1982) (concluding that the Atomic Energy Act
(continued...)

concluded that the challenged state laws conflicted with the objectives of federal

law and were thus preempted on that ground.[5]

---

[4](...continued)
preempted a state initiative measure "prohibiting the transportation and storage within Washington of radioactive waste produced outside the state" because the measure "seeks to regulate legitimate federal activity"); Illinois v. Gen. Elec. Co., 683 F.2d 206, 208, 215 (7th Cir. 1982) (holding that the Atomic Energy Act preempted a state statute prohibiting the transportation into the state for disposal or storage "any spent nuclear fuel which was used in any power generating facility located outside [the state]"); see also N. States Power Co. v. Minnesota, 447 F.2d 1143, 1151 (8th Cir. 1971) (concluding that conditions set forth in a state agency's waste disposal permit regulating the level of radioactive discharges were preempted by the Atomic Energy Act because "Congress intended to pre-empt the field of the licensing and regulation of nuclear reactors . . . and . . . did not intend to provide for dual regulation of radiation hazards"); Hodges, 255 F. Supp. 2d at 553 (concluding that governor's executive order barring the transportation of plutonium on state highways was preempted by the Atomic Energy Act because the order "[u]nquestionably . . . interferes with the exclusive federal authority marked out by the AEA"); United States v. City of New York, 463 F. Supp. 604, 614 (S.D.N.Y. 1978) (holding that "the federal government has exclusive authority under the doctrine of preemption to regulate the construction and operation of nuclear reactors, which necessarily includes licensing for radiological health and safety" and that a section of the New York City Health Code "establishing a dual system of licensing and regulation with control exerted by both the City and the federal government is, therefore, void").

[5] See Nevada v. Watkins, 914 F.2d 1545, 1550, 1561 (9th Cir. 1990) (holding that a state legislature's joint resolution providing that the federal government could not establish an SNF facility without the consent of the state conflicted with the objectives of the NWPA and was therefore preempted); Brown v. Kerr-McGee Chem. Corp., 767 F.2d 1234, 1242-43 (7th Cir. 1985) (holding that the Atomic Energy Act preempted a state law cause of action seeking an injunction ordering removal of radioactive wastes from a particular site because the cause of action "interfere[d] with the NRC's ability to choose the method of disposal that, in light of radiation, nonradiation, and economic considerations, is the most appropriate").

## D. Application of Supreme Court Decisions to the Utah Statutes

In defending the challenged statutes, the Utah officials rely primarily on two parts of the preemption analysis set forth in Pacific Gas, Silkwood, and English. First, they contend that PFS and the Skull Valley Band have failed to offer sufficient evidence that the statutes have "some direct and substantial effect" on decisions made by those who would operate the SNF storage facility. English, 496 U.S. at 85. Second, the Utah officials contend that the challenged statutes are analogous to the state laws upheld in Silkwood and English. We consider these arguments in relation to the specific statutes that the Utah officials seek to defend in this appeal.

### 1. The County Planning Provisions

The Utah officials challenge the district court's merits ruling regarding the County Planning Provisions. As we have noted, those provisions allow a county to either (a) adopt an ordinance barring the transportation and storage of SNF, or (b) allow such transportation and storage, but only if the county adopts a comprehensive land use plan containing detailed information regarding the effects of any proposed SNF site upon the health and general welfare of citizens of the State. See Utah Code Ann. § 17-27-301(3)(b),17-27- 301(3)(a)(i-iii). Counties are indemnified if they choose the former option. Id. § 17-27-308.

The County Planning Provisions also prohibit counties from providing "municipal-type services," including fire protection, garbage disposal, water, electricity, and law enforcement, to SNF transportation and storage facilities within the county. Id. § 17-34-1(3). According to the Utah officials, the district court erred in holding that these provisions are preempted by federal law.

First, the officials question the district court's ruling that these provisions would dramatically increase the costs of operating a SNF storage facility by requiring the operator to provide its own "municipal-type services." They note that the record contains no evidence of such increased costs. See Aplts' Br. at 85-86 (arguing that "Utah, as the nonmoving party in the summary judgment context, is entitled to the inference that the cost to PFS of contracting for local law enforcement services is equal to or more than the cost to PFS of providing the allowed alternative, a private security force"). Second, the Utah officials contrast the costs to PFS of providing such services to the $10 million punitive damages award in Silkwood. If such an award did not have a direct and substantial effect on those making radiological decisions, the defendant officials contend, then neither would the challenged restrictions on county services. Third, the Utah officials maintain that the County Planning Provisions are analogous to state laws upheld by other courts. Fourth, the officials characterize the County Planning Provisions as concerning "areas that characteristically have

-49-

been governed by the States." Aplts' Br. at 88 (quoting <u>Pacific Gas</u>, 461 U.S. at 205-06).

We agree with the district court that the County Planning Provisions are preempted. In requiring county land use plans to "address the effects of the proposed [SNF storage] site upon the health and general welfare of the citizens of the state," including "specific measures to mitigate the effects of high-level nuclear waste . . . [to] guarantee the health and safety of citizens of the state," Utah Code Ann. § 17-27-301(3)(a), these provisions address matters of radiological safety that are addressed by federal law and that are the exclusive province of the federal government. <u>See</u> <u>Pacific Gas</u>, 461 U.S. at 205; <u>see also</u> <u>Kentucky</u>, 252 F.3d at 820-21; (holding that conditions regarding the disposal of radioactive waste imposed by a state agency in a landfill permit were preempted by federal law).

Although the provision requiring a county to address radiological safety issues in its land use plan may not apply if a county adopts an ordinance banning the storage of high level nuclear waste within its borders, <u>see</u> Utah Code Ann. § 17-27-301(3)(b), that alternative provision is itself grounded in safety concerns. <u>See</u> <u>Pacific Gas</u>, 461 U.S. at 213 (holding that "[a] state moratorium [on nuclear power plant construction that was] grounded in safety concerns falls squarely within the prohibited field"); <u>Jersey Cent. Power & Light</u>, 772 F.2d at 1110-12

(holding that a township ordinance prohibiting importation of SNF or other radioactive wastes for the purpose of storage was preempted by federal law). That conclusion follows from the text of the County Planning Provisions, which refers to the effects of nuclear waste on the health and welfare of Utah citizens. See Utah Code Ann. § 17-27-301. Moreover, unlike the state officials in Pacific Gas, the Utah officials here have failed to offer evidence that the provision allowing a county to ban SNF transportation and storage is supported by a non-safety rationale. Cf. Pacific Gas, 461 U.S. at 214-215 (discussing the non-safety rationale—economic concerns—offered to support the state's moratorium on nuclear power plant construction).

The arguments advanced by the Utah officials here do not undermine our conclusion. We do agree with the defendants that the record does not allow a comparison between the costs that would be incurred by PFS if the county provided municipal services to the storage facility and the costs that would be incurred by the use of private contractors to provide those services. However, we do not agree that the burden that the defendant officials seek to impose upon PFS and the Skull Valley Band is appropriate. Pacific Gas, Silkwood, and English do not turn the preemption inquiry upon a precise determination of costs imposed upon the operators of nuclear facilities by the application of state law. Although there may be some costs imposed by a statutory scheme that are so

-51-

minimal that they could not have a "direct and substantial effect" on decisions made by those who operating SNF facilities, see English, 496 U.S. at 85, that argument cannot save the pervasive ban on providing municipal services here at issue. That ban targets only those engaged in SNF transportation and storage and does so for safety reasons. Those factors are sufficient to render a precise determination of the relative costs unnecessary. Cf. Pacific Gas, 461 U.S. at 212.

Silkwood and English do not save the County Planning Provisions. In holding in Silkwood that a $10 million award of punitive damages on a state law claim was not preempted, the Court relied upon "ample evidence that Congress had no intention of forbidding the states from providing" "state-law remedies [to] those suffering injuries from radiation in a nuclear plant." Silkwood, 464 U.S. at 251. English relies on the same evidence. See 496 U.S. at 85-86. The Utah officials identify no analogous evidence that Congress intended to allow detailed regulation of nuclear facilities by county governments, and we have found none.

Moreover, Silkwood and English, both involve generally applicable state tort law that existed before Congress began to regulate nuclear power. See Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 352 (2001) (observing that "[Ms.] Silkwood's claim was . . . based . . . on traditional state tort law

principles of the duty of care owed by the producer of plutonium fuel pins to an employee working in its plant"). Neither case concerns state laws that target the nuclear industry, as the Utah provisions do here.

The two other cases on which the Utah officials rely are also distinguishable. In <u>In re Long Island Lighting Co. (Shoreham Nuclear Power Station, Unit I)</u>, LPB-55-12, 21 N.R.C. 644 (1985), the NRC's Licensing Board concluded that a New York statute and a county ordinance prohibiting the use of private parties to perform law enforcement functions at nuclear facilities was not preempted by federal law concerning nuclear safety. As a result, the Board allowed the state and local governments to bar the use of private parties in an emergency response plan. However, the Licensing Board based that conclusion upon considerable evidence that Congress "deliberately decided not to invade State authority [regarding emergency response plans] or to force States to take specific planning action." <u>Id.</u> at 907. Moreover, "the statutes at issue were passed long before [the operator of the nuclear facility] began emergency planning . . . and for purposes totally unrelated to nuclear power or emergency planning." <u>Id.</u> at 904.

Similarly, in <u>Citizens for an Orderly Energy Policy v. County of Suffolk</u>, 604 F. Supp. 1084 (E.D.N.Y. 1985), the court held that a county legislature's resolution stating that it would refuse to cooperate in radiological emergency

response planning was not preempted by federal law. However, that holding too was based upon the legislative history indicating that "Congress considered the possibility that a state or local government or both would fail to participate in emergency planning." Id. at 1096. Rather than requiring such participation by unwilling local governments, the court noted, Congress provided that utilities could present their own emergency response plans to the NRC. Id.

There is no analogous legislative history supporting the County Planning Provisions here. Rather than allowing state and local governments to ban SNF transportation and storage or to impose their own licensing requirements, Congress has reserved such regulation to the federal government. Thus, the decisions invoked by the Utah officials do not support their argument.

Finally, we disagree with the Utah officials that the County Planning Provisions are not preempted because they concern "areas that characteristically have been governed by the States." Aplts' Br. at 88 (quoting Pacific Gas, 461 U. S. at 205-06). Although it is true that the County Planning Provisions address law enforcement, fire protection, waste and garbage collection and other similar matters that have been traditionally regulated by local governments, that fact does not trump the preemption analysis that the controlling Supreme Court decisions require us to undertake. Under that analysis, we consider the purpose and effect of the state law at issue, and, as a result, a state cannot use its

authority to regulate law enforcement and other similar matters as a means of regulating radiological hazards. That is what the County Planning Provisions attempt to do, and they are thus preempted by federal law.

2. The Unfunded Potential Liability Provisions

Next, the Utah officials argue that the Unfunded Potential Liability Provisions are not preempted. At issue here are the sections of the Utah licensing scheme that require the operator of a SNF storage facility to pay to the state of Utah an amount equal to at least 75% of the "unfunded potential liability" of the project. Utah Code Ann. § 19-3-319(3). That amount is determined by the Department of Environmental Quality, based upon "the health and economic costs expected to result from a reasonably foreseeable accidental release [of SNF]." Id. § 19-3-301(5).

According to the Utah officials, these unfunded liability provisions are designed to "fill in the gaps" in the liability coverage established by the Price-Anderson Act, 42 U.S.C. § 2010. See Cook, 273 F. Supp. 2d at 1182 (discussing "[t]he basic components of the Price-Anderson liability and compensation system as originally enacted"). As a result, they argue, these provisions are analogous to the state laws upheld by the Supreme Court in Silkwood and English. Moreover, the officials maintain that there is no evidence in the record either that these

provisions will have a direct and substantial effect upon decisions regarding radiological safety levels or that the provisions conflict with the objectives of federal law. See Aplts' Br. at 94 (arguing that the unfunded liability provisions "operate only in an area that Congress has left outside the scope of its regulatory scheme ([the Price-Anderson Act])").

In support of their "gap-filling" argument, the Utah officials point to "hot debate and considerable uncertainty," regarding "just which entities and what kinds of nuclear events the [Price-Anderson] Act covers." Aplts' Br. at 91. They characterize the unfunded liability provisions as a legitimate response to this uncertainty.

The Utah officials further explain that "[i]n Utah's view, this uncertainty inheres in transportation to the proposed PFS waste dump (with the issue perhaps turning on the nature of the license held by the source of SNF), storage at the dump (with the issue perhaps turning on the presence or absence of an . . . indemnity agreement [between the PFS and the NRC]), and transportation from the proposed PFS waste dump to a site other than the federal permanent repository (with the issue perhaps turning on the nature of the license held by the original source of the SNF and/or the nature of the license held by the destination)." Aplts' Br. at 91-92. The Utah officials do not argue with further

specificity the extent to which the Price-Anderson Act will apply to the proposed storage facility at issue here.

In considering this argument, we first note that there is some uncertainty as to the proper preemption analysis. In Silkwood, the Supreme Court stated that "insofar as damages for radiation injuries are concerned," 464 U.S. at 256, the appropriate inquiry is whether a conflict exists between federal and state law rather than whether Congress has preempted the entire field. See Silkwood, 464 U.S. at 256. The law at issue there was an award of punitive damages arising out of a state tort claim. See id. at 243-45. In contrast, the state laws at issue here do not involve a claim for damages asserted by a party exposed to radiation. Instead, the statutes concern fees imposed by the state to ensure payment to injured parties if such exposure occurs.

In these circumstances, the parties disagree as to how to read Silkwood's limitation upon the preemption inquiry. PFS and the Skull Valley Band argue that field preemption is applicable, while the Utah officials contend that the court should consider only whether a conflict exits between the state's unfunded liability provisions and federal law or whether, under English, those provisions will have a direct and substantial effect upon decisions regarding radiological safety levels.

In the absence of controlling Supreme Court precedent, we will afford the Utah officials the benefit of the doubt, assuming without deciding, that Utah's unfunded liability provisions concern "damages for radiation injuries," see Silkwood, 464 U.S. at 256, in that they seek to ensure that there are adequate resources to allow injured parties to recover for those injuries. Nevertheless, even under the more limited preemption inquiry set forth in Silkwood, we conclude that the unfunded liability provisions are preempted. In our view, the fact that there may be gaps in the Price-Anderson Act's indemnification and insurance scheme does not establish that states are free to fill those gaps, as Utah has done here.

That conclusion follows from the response of the NRC's Atomic Safety and Licensing Board to the potential gaps in the Price-Anderson scheme. In reviewing PFS's license application, the Licensing Board has recognized that the Price-Anderson Act may not apply to certain aspects of the proposed storage facility. See In re Private Fuel Storage. L.L.C., 51 N.R.C. 101, 132 (2000) (concluding that "it is apparent that in all material respects, transportation-related incidents will be covered under the provisions of the Price-Anderson Act . . . and regulatory implementing provisions" but that the NRC "at this juncture . . . has decided not to invoke its discretionary authority" to apply the Price-Anderson Act to SNF storage facilities) (emphasis added).

-58-

Nevertheless, the Licensing Board proceeded to determine whether PFS had obtained liability insurance "sufficient to cover cost recovery for any foreseeable accident at the PFS facility." Id. at 130. As to offsite liability, the Board found sufficient PFS's $200 million nuclear energy liability policy, the largest one currently available. Id. at 133. As to onsite liability, the Board concluded that further inquiry was necessary before it could properly determine whether PFS had sufficient insurance. See id.[6]

Thus, in requiring PFS to demonstrate the sufficiency of its insurance coverage regarding operations not necessarily covered by the Price-Anderson Act, the Licensing Board has itself filled some of the gaps in that regulatory scheme. Those gap-filling measures are authorized by the Atomic Energy Act and accompanying regulations. See 42 U.S.C. §§ 2073, 2092, 2093, 2111, and 2201(b) (granting the NRC regulatory jurisdiction over the constituent materials of spent nuclear fuel); 10 C.F.R. § 72.40(a)(6) (providing, inter alia, that an applicant for a license to store SNF must be "financially qualified" to engage in the proposed activity); id. § 72.44 (providing that the NRC may impose

---

[6] The NRC affirmed the Licensing Board's decision to "include in PFS's license, as license conditions, promises made by PFS during the licensing process . . . including its commitments . . . to obtain insurance for offsite liability in the amount of $200 million (the maximum amount commercially available); and, to obtain insurance covering onsite liability in an amount to be determined at hearing." See In re Private Fuel Storage, No. 72-22-ISFSI, CLI-00-13, 2000 WL 1146337, at *9 (NRC, Aug. 1, 2000).

conditions on a license); see also Bullcreek, 359 F.3d at 538 (concluding that the NRC has authority to license and regulate the storage and disposal of SNF).

In light of the "gap-filling" undertaken by the NRC and its Licensing Board, Utah's unfunded liability provisions conflict with the objectives of federal law. See Silkwood, 464 U.S. at 256. Those statutes allow the state of Utah to make an independent determination of "the dollar amount of the health and economic costs expected to result from a reasonably foreseeable accidental release of waste involving a transfer or storage facility, or during transportation of waste, within the exterior boundaries of the state" and subject the operator of an SNF storage facility to the loss of its license unless it pays 75% of that amount to the DEQ. Utah Code Ann. § 19-3- 301-(5)(a), 19-3-319(3)(a). Under the federal licensing scheme however, it is not the states but rather the NRC that is vested with the authority to decide under what conditions to license an SNF storage facility. The Utah statutes are thus preempted by federal law. Cf. Brown v. Kerr-McGee Chem. Corp., 767 F.2d 1234, 1243 n.7 (7th Cir. 1985) (holding that a state court injunction barring storage at a particular area "frustrate[d] the objectives of federal law by preventing the NRC from choosing what may be the most appropriate method of storing this radioactive material" and was therefore preempted); City of New York, 463 F. Supp. at 614 (holding that a section of the New York City Health Code "establishing a dual system of licensing and

regulation with control exerted by both the City and the federal government" was preempted).

Silkwood and English do not alter this conclusion. As we have noted, those cases rely on evidence that, in enacting the Price-Anderson Act, Congress "assumed that persons injured by nuclear accidents were free to utilize existing state tort law remedies." Silkwood, 464 U.S. at 252. Utah's unfunded liability provisions cannot be characterized as "existing state tort law remedies." Moreover, neither case addresses the conflict between the federal provisions we have discussed (involving limitations on liability, indemnification, and the determination of financial responsibility) and state laws like those at issue here.

### 3. Abolition of Limited Liability

Next, the Utah officials argue that the district court erred in holding that federal law preempts the state statute abolishing limited liability for stockholders in companies operating SNF storage facilities, Utah Code Ann. § 19-3-316. The officials focus on the district court's conclusion that the abolition of limited liability would impose additional costs upon PFS. See Skull Valley, 215 F. Supp. 2d at 1247 (stating that "[a]t the least, there would be an additional, substantial cost of insurance to officers, directors, and PFS, and a corresponding effect on the safety measures employed by the facility"). According to the Utah

-61-

officials, there is no evidence in the record that such costs would be incurred. Additionally, the Utah officials contend that "PFS never demonstrated and the district court never determined what, if any, of PFS's proposed activities will fall outside the [Price-Anderson Act's] scope." Aplts' Br. at 97. Thus, they reason, it remains possible that PFS's shareholders would face no liability for a radiological accident involving the proposed storage facility.

Because Utah's abolition of limited liability "frustrate[s] the objectives of federal law," Silkwood, 464 U.S. at 256, we agree with the district court that the challenged statute is preempted. Under Utah law, stockholders are generally not personally liable for the debts of a corporation. See Norman v. Murray First Thrift & Loan Co., 596 P.2d 1028, 1030 (Utah 1979) ("[I]n order to disregard the corporate entity, there must be a concurrence of two circumstances: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow."). The Supreme Court has noted that "[l]imited liability [of stockholders] is the rule not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital

attracted." Anderson v. Abbott, 321 U.S. 349, 362 (1944).[7] Section 19-3-316

removes this well-established protection, and does so for reasons that the Utah

officials concede are related to radiological safety concerns. See Aplts' Br. at 96

(stating that "[t]he Legislature was aware that a PFS-type enterprise would create

risks of an almost unfathomable magnitude and that the scope of the [Price-

Anderson Act] relative to a PFS-type facility was uncertain" and therefore

abolished limited liability).

In contrast, in enacting the Atomic Energy Act and subsequent

amendments, "Congress' purpose was to remove the economic impediments in

order to stimulate the private development of electric energy by nuclear power

while simultaneously providing the public compensation in the event of a

catastrophic nuclear incident." Duke Power Co. v. Carolina Envtl. Study Group,

Inc., 438 U.S. 59, 83 (1978). By upending a fundamental principle of corporate

law as applied to SNF storage facilities, § 19-3-316 disrupts the balance that

Congress sought to achieve. In light of the conflict between the state statute and

federal objectives, we agree with the district court that it is unnecessary to

---

[7] See also Byron F. Egan, Choice of Entity Alternatives, 39 TEX. J. BUS. L. 379, 418-19 (2004) (noting that "[l]imited liability is one of the most important advantages of doing business as a corporation" and that "[i]n corporate law, it is fundamental that shareholders, officers, and directors are ordinarily protected from personal liability arising from the activities of the corporation"); Frank H. Easterbrook & Daniel R. Fischel, Limited Liability and the Corporation, 52 U. CHI. L. REV. 89, 89 (1985) ("Limited liability is a fundamental principle of corporate law.")

consider evidence of the specific costs imposed upon PFS by the elimination of limited liability.

Moreover, we again reject the Utah officials' contention that the state laws that survived preemption in Silkwood and English are analogous to the Utah statute. Here, the abolition of limited liability attempts a sea change in the law of corporations and is targeted at the nuclear industry only. The statutes do not involve a state tort remedy that existed prior to the enactment of federal legislation regarding nuclear power and that Congress intended to preserve. See English, 496 U.S. at 83; Silkwood, 464 U.S. at 252.

4. The Road Provisions

The Utah officials argued that the four Road Provisions are not preempted. As we have explained, these provisions amend the Utah statutes by (1) requiring the concurrence of the governor and the legislature to resolve disputes arising out of the request to construct a railroad crossing made by an entity engaged in SNF storage and transportation; (2) designating certain county roads and trails near the Skull Valley Reservation as "statewide public safety interest highways," and providing that the state Department of Transportation has jurisdiction and control over them, Utah Code Ann. § 72-3-301; (3) removing control of the only road permitting access to the Skull Valley Reservation and

PFS's proposed facility from the county by designating it as a state highway; and (4) requiring the consent of the governor and the state legislature before the Department of Transportation may grant a right of way to a company engaged in the transportation or storage of SNF. See id. §§ 54-4-15, 72-3-301, § 72-4-125(4), and 54-4-15(4)(b).

According to the Utah officials, the district court erred by failing to explain how these statutes affect radiological safety decisions. The officials also criticize the district court for relying on findings regarding the legislature's motive in passing these statutes. Finally, the state officials argue that PFS's preferred method for transporting SNF to the proposed storage site is a rail line, and that, as a result, the statutes will probably not affect access to the storage facility.

These arguments are based largely on this circuit's decision in Blue Circle Cement, Inc. v. Board of County Commissioners, 27 F.3d 1499 (10th Cir. 1994). There, in considering whether a county's hazardous waste zoning ordinance violated the Resources Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992, we disagreed with the district court's focus on whether the ordinance represented a "good faith adaptation of federal policy to local conditions." Id. at 1508 (internal quotation marks omitted). We concluded that the ordinance should be evaluated on an objective rather than a subjective basis. See id. ("[W]e are on

firmer footing if we utilize an objective approach, asking whether a legitimate local concern has been identified and whether the ordinance is a reasonable response to that concern."). Significantly, we added that "we must also examine the impact of the local ordinance on the objectives of the federal statute." Id. at 1508-09.

Blue Circle Cement does not concern the federal law regulating nuclear safety and, as a result, its objective approach, while instructive, is not controlling. Instead, we are required to follow the preemption analysis set forth in Pacific Gas, Silkwood, and English, which requires consideration of the purpose of the allegedly preempted statute, along with its effects. See English, 496 U.S. at 84-85 (noting that "the Court [in Pacific Gas] defined the pre-empted field, in part by reference to the motivation behind the state law," and in part by whether the law has "some direct and substantial effect on the decisions made by those who build or operate nuclear facilities") (emphasis added).

Here, the evidence cited by the district court indicates that the Road Provisions were enacted in order to prevent the transportation and storage of SNF in Utah. See Skull Valley, 215 F. Supp. 2d at 1248 n.10. The state legislator who sponsored the Road Provisions explained that they established a "moat" around the proposed SNF site, and the Governor added that the Road Provisions "will add substantially to our ability as a state to protect the health

and safety of our citizens against the storage of high-level nuclear waste." Id. (internal quotation marks omitted). In the 1999 State of the State address, the Governor announced that he would deny permission for the rail crossings needed to provide access to the proposed SNF facility. Aplts' App. at 583.

The Utah officials do not attempt to contest any of this evidence; nor is it likely that they could. The record thus establishes that the Road Provisions were enacted for reasons of radiological safety and are therefore preempted. Cf. Pacific Gas, 461 U.S. at 213 (observing that "[a] state moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field"). Moreover, as the district court concluded, by jeopardizing access to the proposed SNF storage facility, the Road Provisions directly and substantially affect decisions regarding radiological safety levels by those operating nuclear facilities. See Skull Valley, 215 F. Supp. 2d at 1249.

The contingencies invoked by the Utah officials—e.g., that a different governor might be in office by the time the facility opened and that PFS might not need road access at all if it proceeds with its plan to construct a rail line—do not alter our conclusion. The Road Provisions create a substantial obstacle to the construction of an SNF storage facility now. The fact that their future impact may be different than PFS now anticipates alters neither the statutes' current

effect on PFS's decisions nor the fact that they arise out of radiological safety concerns.

5. The Licensing Provisions

Finally, the Utah officials challenge the district court's ruling as to certain provisions in Part 3 of the state's Radiation Control Act. Importantly, the officials concede that "some portions of the licensing provisions purport to regulate in areas where federal regulation is present, indeed, exclusive–such as the radiological safety aspects of the proposed PFS facility." Aplts' Br. at 103 (internal quotation marks omitted). However, they further maintain that some of the provisions of the state licensing scheme "regulate in areas where federal regulation is absent, that is, in the gaps." Id. (internal quotation marks omitted). These gap-filling state law provisions, the officials maintain, are not preempted.

In support of this argument, the Utah officials cite California Coastal Commission v. Granite Rock Co., 480 U.S. 572, 593 (1987). There, a mining company asserted a facial challenge to a state agency's requirement that it obtain a permit for coastal development. The mining company asserted that the state regulations were preempted by United States Forest Service regulations, federal land use statutes, and the Coastal Zone Management Act of 1972, 16 U.S.C. §§ 1451-1465.

In rejecting the mining company's facial challenge, the Court noted that

the mining company has alleged that the state agency's true purpose in enforcing

the permit requirement was to prohibit mining entirely. However,

> [b]y choosing to seek injunctive and declaratory relief
> against the permit requirement before discovering what
> conditions the Coastal Commission would have placed on
> the permit, [the mining company] has lost the possibility
> of making this argument in this litigation. [The mining
> company's] case must stand or fall on the question [of]
> whether *any possible* set of conditions attached to the . .
> . permit requirement would be pre-empted.

Id. at 588 (emphasis in original). The Utah officials suggest that PFS and the

Skull Valley Band have made a similarly flawed facial challenge here.

Unfortunately, the Utah officials do not specify which particular

provisions of the licensing scheme fill in the gaps of the federal scheme. See

Aplts' Br. at 102-06. Moreover, Granite Rock does not indicate that a gap-

filling approach should be applied here. In Granite Rock, the Court noted that

the federal statutes and regulations at issue contemplated substantial state and

local regulation of land-use matters.[8] However, with regard to matters of

---

[8] See Granite Rock, 480 U.S. at 583 (stating that "[u]pon examination, however,
the Forest Service regulations that [the mining company] alleges pre-empt any
state permit requirement not only are devoid of any expression of intent to
pre-empt state law, but rather appear to assume that those submitting plans of
operations will comply with state laws"); id. at 588 (discussing federal land use
statutes and stating that "[c]onsidering the legislative understanding of
environmental regulation and land use planning as distinct activities, it would be
anomalous to maintain that Congress intended any state environmental regulation

(continued...)

radiological safety, Congress did not intend such an overlapping system of federal and state regulation. See Pacific Gas, 461 U.S. at 212 ("[T]he federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states."); Farley, 115 F.3d at 1502 (stating that, under the Atomic Radiation Act, "[h]azards arising from atomic radiation were made a particularly federal concern, as to which the states had no authority to regulate").

As the district court recognized, under the preemption analysis set forth in Pacific Gas, Silkwood, and English, the licensing provisions set forth in Part 3 of Utah's Radiation Control Act are "grounded in [radiological] safety concerns," Pacific Gas, 461 U.S. at 213, and also have "some direct and substantial effect on the decisions," English, 496 U.S. at 85, regarding radiological safety levels of SNF in Utah. As a result, the licensing provisions are preempted by federal law.

---

[8](...continued)
of unpatented mining claims in national forests to be per se pre-empted as an impermissible exercise of state land use planning"); id. at 593 (stating that the federal Coastal Zone Management Act "does not automatically pre-empt all state regulation of activities on federal lands").

## IV. CONCLUSION

In holding the Utah statutes preempted, we do not denigrate the serious concerns of Utah's citizens and lawmakers regarding spent nuclear fuel, a matter which presents complex technological, economic, and political challenges to those seeking effective solutions. However, in the matter of nuclear safety, Congress has determined that it is the federal government, and not the states, that must address the problem. We also note that many of the concerns that Utah has attempted to address through the challenged statutes have been considered in the extensive regulatory proceedings before the NRC, as well as in appeals from the NRC's decisions. We are hopeful that Utah's concerns–and those of any state facing this issue in the future–will receive fair and full consideration there.

We thus AFFIRM the district court's decision.